The COLORADO CIVIL RIGHTS COMMISSION ex rel. Reyes RAMOS, Petitioner,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate, Respondent.

No. 87SC4.

Supreme Court of Colorado, En Banc.

July 18, 1988.

---

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Laura E. Udis, Asst. Atty. Gen., Denver, for petitioner.

Rosemary Augustine, Boulder, for respondent.

QUINN, Chief Justice.

The question in this case is whether the Colorado Civil Rights Commission (Commission) has jurisdiction over the Board of Regents of the University of Colorado (Regents) in matters of discriminatory employment practices prohibited by state law. The district court held that the Commission lacked such jurisdiction and thus ordered it to dismiss a complaint filed by Reyes Ramos, an associate professor at the University of Colorado, who alleged that the Regents denied him a tenured appointment on the basis of his national origin or ancestry. We reverse the judgment and remand the case to the district court with directions to return the case to the Commission for further proceedings.

### I.

Various constitutional and statutory provisions provide the legal framework for the jurisdictional issue raised here. These provisions relate to the Regents' supervisory authority over the University of Colorado and to the Commission's jurisdiction and authority over matters relating to discriminatory practices in employment. We will initially summarize these pertinent constitutional and statutory provisions and then outline the factual circumstances out of which the jurisdictional issue in this case arises.

### A.

The Colorado Constitution provides that the establishment and management of state institutions "shall be subject to the control of the state, under the provisions of the constitution and such laws and regulations as the general assembly may provide." Colo. Const. art. VIII, § 5(1). Article IX, section 12 of the Colorado Constitution establishes the Regents as a "body corporate." The extent of their authority is outlined in article VIII, section 5(2) of the Colorado Constitution as follows:

The governing boards of the state institutions of higher education, whether established by this constitution or by law, shall have the general supervision of their respective institutions and the exclusive control and direction of all funds of and appropriations to their respective institutions, unless otherwise provided by law.

By statute, the General Assembly has acknowledged the Regents' general supervisory authority over the University and their control over University funds and appropriations, § 23–20–111, 9 C.R.S. (1987 Supp.), and also has conferred on the Regents the following general governing powers:

The board of regents shall enact laws for the government of the university; appoint the requisite number of professors, tutors, and all other officers; and determine the salaries of such officers and the amount to be paid for tuition in accordance with the level of appropriations set by the general assembly for the university. It shall remove any officer connected with the university when in its judgment the good of the institution requires it.

§ 23–20–112, 9 C.R.S. (1973). In accordance with their lawmaking authority, the Regents enacted a law requiring that all tenured and other appointments "shall be subject to the Constitution and Statutes of the State of Colorado." Laws of the Regents, art. X, § 1A(1) (June 1986). The Regents' law was in effect at the time of the events underlying the litigation at issue here.

The Commission was formally created in 1979, ch. 239, sec. 3, § 24–34–303, 1979 Colo. Sess. Laws 922, 923, replacing the Colorado Anti–Discrimination Commission which had been established in 1957, ch. 176, sec. 3, 1957 Colo. Sess. Laws 492, 493. The

General Assembly has delegated to the Commission a broad range of powers and duties directed towards the elimination of discriminatory practices based on handicap, race, creed, color, sex, marital status, and national origin or ancestry in the areas of employment, housing, public accommodation, and advertising. The Director of the Civil Rights Division is specifically authorized to investigate any complaint filed by any aggrieved person alleging a discriminatory practice and, if probable cause exists for crediting the allegations, to make efforts to eliminate such practice by conference, conciliation, and persuasion. § 24–34–306(2) and (3), 10 C.R.S. (1982). If satisfied that such efforts will be futile, the director is authorized to report the matter to the Commission, which may then issue a written notice and complaint requiring the respondent to answer the charges at a formal hearing before the Commission, a commissioner, or an administrative law judge. § 24–34–306(4), 10 C.R.S. (1987 Supp.).[1] If it is found that a respondent has engaged in a discriminatory practice, the Commission is authorized to order the respondent to cease and desist from such discriminatory practice and may also take such other action as specifically authorized by statute. § 24–34–306(9), 10 C.R.S. (1982).

In keeping with the legislative charge to the Commission to eliminate discriminatory practices in employment, the General Assembly has enacted legislation making it a discriminatory employment practice "[f]or an employer to refuse to hire, to discharge, to promote or demote, or to discriminate in matters of compensation against any person otherwise qualified because of handicap, race, creed, color, sex, age, national origin, or ancestry." § 24–34–402(1)(a), 10 C.R.S. (1987 Supp.).[2] An employer is defined as follows:

1. The version of section 24–34–306(4) in effect at the time of the administrative proceedings in this case authorized a hearing before the Commission, a commissioner, or "a hearing officer." § 24–34–306(4), 10 C.R.S. (1982).

2. Colorado's law prohibiting discriminatory practices in employment was closely fashioned after a 1945 New York statute, 1945 New York

Laws, ch. 118, sec. 1, which was the first to adopt a Commission approach to the administration and enforcement of civil rights. Penwell, *Civil Rights in Colorado* 46 Denver L.J. 181, 186 (1969). In the New York statute, the legislature declared "that practices of discrimination against any of its inhabitants because of race, creed, color or national origin are a matter of state concern, that such discrimination

"Employer" means the state of Colorado or any political subdivision, commission, department, institution, or school district thereof, and every other person employing persons within the state; but it does not mean religious organizations or associations, except such organizations or associations supported in whole or in part by money raised by taxation or public borrowing.

§ 24–34–401(3), 10 C.R.S. (1982). For purposes of the Commission's regulatory authority over prohibited discriminatory practices, section 24–34–301(5), 10 C.R.S. (1982), defines "person" to mean "one or more individuals, partnerships, associations, corporations, legal representatives, trustees, receivers, or the state of Colorado, and all political subdivisions and agencies thereof." If the Commission finds that an employer has engaged in a discriminatory employment practice, it may order the employer to take remedial actions including "affirmative action regarding hiring, reinstatement, or upgrading of employees, with or without back pay." § 24–34–405, 10 C.R.S. (1982).

### B.

At the commencement of the 1980–81 academic year, Reyes Ramos was appointed to a four-year term as an associate professor of Chicano studies and education at the Boulder campus of the University of Colorado, and to a three-year term as Director of the Chicano Studies Program. Ramos was reviewed for tenure during the 1982–83 academic year and was notified by letter in May 1983 that he would not be recommended for a tenured appointment.

On November 1, 1983, Ramos filed a complaint with the Commission in which he alleged that he was denied a tenured appointment because of his Hispanic origin or ancestry. The director of the Commission found probable cause that Ramos had been denied tenure due to impermissible discrimination, served the Regents with written notice of the charge, and, pursuant to section 24–34–306(4), 10 C.R.S. (1982), scheduled a hearing before a hearing officer.

The Regents filed a motion to dismiss the complaint on the basis that the Commission lacked jurisdiction over the subject matter. On October 22, 1984, the hearing officer granted the Regents' motion to dismiss, reasoning that subjecting the Regents to the jurisdiction of the Commission would violate article VIII, section 5(2) of the Colorado Constitution which grants the Regents general supervisory authority over the University of Colorado. The Commission, pursuant to section 24–4–105(14), 10 C.R.S. (1982), elected to review the initial decision of the hearing officer. On May 31, 1985, the Commission ruled that it did have jurisdiction over the Regents, stating as follows:

It is apparent from [article VIII, section 5(2) of the Colorado Constitution] that the Regents of the University of Colorado are not granted unfettered authority to operate the university. The constitution clearly imposes limits on that power by subjecting the university to the laws and regulations of the state. It grants the regents exclusive control and direction only with regard to its funds and appropriations. In contrast, the regents are empowered to "generally supervise" the university unless the general assembly has provided otherwise by means of the enactment of a state law. The legislature has enacted such a law, section 24–34–402, C.R.S. (1982), precisely because the eradication of discriminatory employment practices is a matter of statewide concern.

The Commission thus concluded that since "the general assembly has passed a statute regulating the conduct of all employers and has not merely established a code for the functioning of governmental organizations, the regents' general supervision over the university's affairs must yield to the state's authority to impose employment practices statewide." The Commission found further support for its conclusion in article X, section 1A(1) of the Laws of the

threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundations of a free democratic state." 1945 New York Laws, ch. 118, sec. 1, § 125 (substituted law currently codified at New York Exec. Law § 290 (McKinney 1982)).

Regents, which expressly requires that all appointments made by the Regents shall be subject to the constitution and statutes of the state of Colorado.

The Regents filed a complaint in the Denver District Court, seeking judicial review of the Commission's ruling. The district court held that, in light of this court's decision in *Associated Students v. Regents,* 189 Colo. 482, 543 P.2d 59 (1975), which held that the Open Meetings Law did not apply to the Regents, and this court's more recent ruling in *Uberoi v. University of Colorado,* 686 P.2d 785 (Colo.1984), which held the Open Records Act likewise inapplicable to the Regents, the statutory scheme directed against employment discrimination did not sufficiently evidence a legislative intent to include the Regents within its prohibitions and thereby subject them to the jurisdiction of the Commission. The district court therefore reversed the Commission's order and remanded the case to the Commission with directions to dismiss Ramos' complaint.

The Commission appealed the district court's decision to the court of appeals. Pursuant to C.A.R. 50, the Commission and the Regents thereafter filed with this court a joint petition for certiorari review prior to the rendition of judgment by the court of appeals, claiming that the appeal raised a matter of statewide importance not previously decided by this court. We granted the petition.

## II.

The issue before us is whether the Commission's exercise of jurisdiction over the Regents in a matter of alleged employment discrimination is in violation of the provisions of article VIII, section 5(2) of the Colorado Constitution, which grants the Regents general supervisory authority over the University of Colorado "unless otherwise provided by law." In support of its assertion of jurisdiction over the Regents, the Commission argues that the statutory definition of "employer" in section 24-34-401(3), 10 C.R.S. (1982), when considered in the context of the statutory scheme directed against employment dis-

crimination and the legislative grant of jurisdiction to the Commission to investigate and adjudicate claims of employment discrimination, provides clear and unmistakable support for the Commission's exercise of jurisdiction over the Regents in this case. We are satisfied that the General Assembly, in enacting legislation proscribing discriminatory employment practices on a statewide basis and investing the Commission with jurisdiction to investigate and adjudicate such claims, has thereby "otherwise provided by law" for purposes of article VIII, section 5(2) of the Colorado Constitution and has thus manifested an unequivocal intent to subject the Regents to the jurisdiction of the Commission in matters of alleged employment discrimination.

Article VIII, section 5(2) of the Colorado Constitution grants the Regents general supervisory authority over the University, but the Regents' authority is neither exclusive nor absolute. The management of a state institution such as the University of Colorado is expressly subject to the control of the state under "such laws and regulations as the general assembly may provide," Colo. Const. art. VIII, § 5(1), and the "unless otherwise provided by law" clause of article VIII, section 5(2) clearly contemplates a limited power of "general supervision" only. Although decisions regarding tenure are central to the educational function of the University and generally lie within the discretion of the Regents, *see* § 23-20-112, 9 C.R.S. (1973), such decisions are certainly not immune from scrutiny under the equal employment opportunity criteria of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (1982). *E.g., Zahorik v. Cornell University,* 729 F.2d 85, 91-94 (2d Cir.1984); *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1341-45 (9th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed. 2d 59 (1982); *see generally Carlile v. South Routt County School District Re-3J,* 739 F.2d 1496, 1499-1500 (10th Cir. 1984). In the absence of some demonstrably countervailing constitutional or statutory rule, we know of no reason why the alleged denial of tenured status to a faculty member on the basis of a prohibited

form of discrimination should not be subject to the enforcement procedures of a state statutory scheme clearly intended to redress such discriminatory practices at all levels of state and local government.

No one could quarrel today with the proposition that it is a basic responsibility of government to redress discriminatory employment practices on the basis of handicap, race, creed, color, sex, national origin, or ancestry. The General Assembly has undertaken to fulfill this responsibility in several ways. First, as pertinent here, it has expressly prohibited an employer from discriminating in matters pertaining to employment on grounds of national origin or ancestry. § 24-34-402(1)(a), 10 C.R.S. (1987 Supp.). In addition, the General Assembly has defined employer in a singularly expansive fashion to mean the state of Colorado, its political subdivisions and its departmental and institutional components, and "every other person employing persons within the state," § 24-34-401(3), 10 C.R.S. (1982), and has similarly defined "person" to include one or more individuals, corporate and other forms of business associations, and the state of Colorado and all political subdivisions and agencies of the state, § 24-34-301(5), 10 C.R.S. (1982). Third, the General Assembly has created the Commission as the regulatory body responsible for remedying discriminatory employment practices and has vested the Commission with various powers and responsibilities directed toward the achievement of that goal. §§ 24-34-301 to -308, 10 C.R.S. (1982 & 1987 Supp.).

A court's primary task in construing a statute is to ascertain and give effect to the legislative intent or purpose of the statutory enactment. *E.g., Colorado Common Cause v. Meyer,* 758 P.2d 153, 160 (Colo.1988); *People v. Guenther,* 740 P.2d 971, 975 (Colo. 1987); *Engelbrecht v. Hartford Accident and Indemnity Co.,* 680 P.2d 231, 233 (Colo. 1984). The starting point for ascertaining legislative intent or purpose is the statutory language itself. *E.g., Colorado Common Cause v. Meyer,* 758 P.2d at 160; *Guenther,* 740 P.2d at 975; *People v. District Court,* 713 P.2d 918, 921 (Colo. 1986). We find especially

significant in this respect the breadth of the language used by the General Assembly in defining the word "employer" in section 24-34-401(3), 10 C.R.S. (1982), which includes not only the state of Colorado, its political subdivisions, commissions, departments, institutions, and school districts, but also, what is even more encompassing in its scope, "every other person employing persons within the state." Supplementing this expansive definition of "employer" in section 24-34-401(3) is the statutory definition of "person" which, as pertinent here, includes "one or more individuals, ... corporations, ... or the state of Colorado, and all political subdivisions and agencies thereof." § 24-34-301(5), 10 C.R.S. (1982). The Regents function not only as an agency of the state in matters pertaining to the University of Colorado, Colo. Const. art. VIII, § 5, *see In re Macky's Estate,* 46 Colo. 79, 96, 102 P. 1075, 1081 (1909), but also have been constitutionally commissioned as a "body corporate," Colo. Const. art. IX, § 12, with rights and responsibilities analogous to those of a private corporation. *People ex rel. Jerome v. Regents,* 24 Colo. 175, 178–79, 49 P. 286, 287–88 (1897). The far-reaching language employed by the General Assembly in defining "employer" in section 24-34-401(3), along with the similarly extensive grant of regulatory authority to the Commission over all "persons," which by definition includes corporations, the state of Colorado, and any and all of its "agencies," is clearly consistent with a legislative intent to subject the Regents as an "employer" to the jurisdiction of the Commission when, as here, a University employee claims that the Regents denied him a tenure appointment on the basis of his national origin or ancestry.

In addition to focusing on the statutory language employed by the General Assembly, we must make certain assumptions regarding legislative purpose. In the instant case, for example, we must assume that the General Assembly intended a just and reasonable result and a result feasible of execution and consistent with the public interest, § 2-4-201(1), 1B C.R.S. (1980),

when it enacted into law a broad statutory scheme directed towards the elimination of discriminatory employment practices throughout the state and vested the Commission with authority to redress proven statutory violations. It would make little sense for the General Assembly to broadly define "employer" so as to include the state and all its political subdivisions and institutions and "every other person employing persons within the state," § 24–34–401(3), 10 C.R.S. (1982), and then to expressly exclude from the definition certain religious organizations and associations but no other category of employer, *id.*, and yet not to have intended that the Regents of the University of Colorado be subject to the statutory prohibition against discriminatory employment practices.

Furthermore, in our effort to effectuate the ends for which Colorado's employment practices legislation was enacted, we may appropriately consider the consequences of a construction that would exclude the Regents from the jurisdiction of the Commission in matters of employment discrimination. *See, e.g., Colorado Common Cause v. Meyer,* 758 P.2d at 160; *United States v. Wilkinson,* 686 P.2d 790, 792 (Colo.1984); *Mooney v. Kuiper,* 194 Colo. 477, 479, 573 P.2d 538, 539 (1978). To engraft such a construction on the statutory definition of employer in section 24–34–401(3), 10 C.R.S. (1982), would result in forcing article VIII, section 5(2) of the Colorado Constitution into the unintended service of granting the Regents immunity from the processes of the very body created to eliminate discriminatory employment practices throughout the state.[3]

■ We agree with the observations of the New York Court of Appeals in *Board of Higher Education v. Carter,* 14 N.Y.2d 138, 199 N.E.2d 141, 250 N.Y.S.2d 33 (1964), which, in holding that the New York State Commission Against Discrimination had jurisdiction over complaints alleging discriminatory promotional practices by the Board of Higher Education of the City of New York, a public agency created by the legislature to administer the collegiate public educational system in New York City, stated as follows:

It is not easy to escape the fact that discrimination in employment, with the consequent economic disparities upon which other kinds of discrimination thrive, is the main key to the problem. We ought not, therefore, construe the statute against discrimination restrictively to cut down in the field of public employment the authority of the only State agency which by law has been charged with the single duty of attacking discrimination in its economic center.

14 N.Y.2d at 153, 199 N.E.2d at 147, 250 N.Y.S.2d at 41. While the New York Constitution expressly prohibited discrimination "because of race, color, creed or religion," New York Const. art. I, § 11, and no similar constitutional provision exists in Colorado, we have nonetheless expressly recognized that there are "fundamental and inherent rights with which all humans are endowed even though no specific mention is made of them in either the national or state constitutions," and that among these rights is the right to acquire a home without regard to race or color. *Colorado Anti–Discrimination Commission v. J.L. Case,* 151 Colo. 235, 243–46, 380 P.2d 34, 39–41 (1962). The right to equal employment opportunity without regard to one's national origin or ancestry stands on the same footing.

■ In our view, Colorado's comprehensive legislation directed at the elimination of discriminatory employment practices throughout the state satisfies the "unless otherwise required by law" provision of article VIII, section 5(2) of the Colorado Constitution by manifesting a clear and unmistakable intent to subject all governmental and private employers in the state

---

**3.** A construction of the employment practices legislation which excluded the Regents from the jurisdiction of the Commission would result in also excluding them from the ameliorating processes of reconciliation, education, and long term institutional changes which address equal opportunity in employment. Moreover, the exclusion of the Regents from the statutory scheme would result in limiting the state remedy available to an aggrieved party to a common-law action in damages rather than the preventative mechanisms for resolution which the Commission is expressly authorized to implement.

of Colorado, including a governmental and corporate body such as the Regents, to the statutory scheme, the only exception being certain religious organizations or associations not supported in whole or in part by tax revenues or public borrowing. We thus hold that Colorado's statutory proscription against discriminatory employment practices applies to the Regents and that the Commission may exercise jurisdiction over the Regents in matters of alleged discriminatory employment practices.

### III.

In so holding, we are not unmindful of our prior decisions in *Associated Students v. Regents*, 189 Colo. 482, 543 P.2d 59 (1975); *Uberoi v. University of Colorado*, 686 P.2d 785 (Colo. 1984); and *State Department of Institutions v. Colorado Civil Rights Commission*, 185 Colo. 42, 521 P.2d 908, *appeal dismissed*, 419 U.S. 1084, 95 S.Ct. 672, 42 L.Ed.2d 677 (1974). The Regents argue that these decisions preclude the Commission's exercise of jurisdiction in this case due to the failure of section 24-34-401(3), 10 C.R.S. (1982), to explicitly refer to the Regents in defining the term "employer" for purposes of discriminatory employment practices. We find the Regents' argument unconvincing.

### A.

In *Associated Students*, 189 Colo. 482, 543 P.2d 59, we considered the applicability of the Open Meetings Law, §§ 24-6-401 and -402, 10 C.R.S. (1982), to executive sessions of the Regents which, pursuant to a law enacted by the Regents, were closed to the public. The Open Meetings Law provided, in pertinent part, that all meetings of any "policy-making or rule-making body of any state agency or authority" were to be open to the public "except as may be otherwise provided in the state constitution." § 24-6-402(1), 10 C.R.S. (1982). After noting the Regents' general supervisory authority over the University of Colorado, Colo. Const. art. VIII, § 5(2); § 23-20-111, 9 C.R.S. (1973), and the Regents' statutory authority to "enact laws for the government of the university," § 23-20-112, 9 C.R.S. (1973), we concluded that the Open Meetings Law was inapplicable to the Regents because "[g]eneral legislation does not repeal conflicting special statutory or constitutional provisions unless the intent to do so is clear and unmistakable." 189 Colo. at 485, 543 P.2d at 61. The Open Meetings Law at issue in *Associated Students* expressly qualified the scope of the statute by means of a clause stating that the statute was applicable "except as may be otherwise provided in the state constitution," and, in addition, expressly limited its terms to policy-making or rulemaking bodies of any state agency or of the General Assembly. In contrast to the Open Meetings Law, the employment practices legislation at issue here contains no such qualifying language directing that other constitutional or statutory provisions should supersede the statutory scheme. Moreover, while the language in *Associated Students* might be viewed as far reaching in scope when read in isolation, this language loses much of its force when read against the obvious purpose of Colorado's employment practices legislation, which is to prohibit and eliminate discriminatory employment practices by all public and private employers in the state, the only exception being for certain designated religious organizations or associations. The unequivocal legislative declaration that discriminatory employment practices on the basis of national origin or ancestry are not permissible in the state of Colorado places the present case on a footing significantly different from *Associated Students*.

In *Uberoi*, 686 P.2d 785, we addressed the applicability of the Open Records Act, §§ 24-72-201 to -206, 10 C.R.S. (1982), to the Regents, and held that even though the statutory definition of public records included "all writings made, maintained, or kept by the state or any agency, institution, or political subdivision thereof," § 24-72-202(6), 10 C.R.S. (1982), the language in the Open Records Act did not sufficiently demonstrate a legislative intent "to make the Open Records Act applicable to the University of Colorado." 686 P.2d at 788. We emphasized in *Uberoi*, as we did in *Associated Students* but in contrast to the instant case, that the Open Records Act was qualified by the phrase "except ... as otherwise specifically provided by

law," § 24–72–201, 10 C.R.S. (1982), and was limited in its scope to the record-keeping functions of governmental bodies. As already pointed out, not only does the employment practices legislation under consideration here contain no such qualifying language, but the broadly inclusive definition of "employer" to include all public and private employers, except certain designated religious institutions, demonstrates an obvious legislative intent not to qualify the applicability of the employment practices legislation by other constitutional or statutory provisions granting authority to specific governmental and corporate entities, such as the Regents, to manage their respective operations.

An additional reason to reject *Associated Students* and *Uberoi* as controlling precedent for the instant case is the fact that the General Assembly has repudiated the holdings of both cases by amendatory legislation. A legislative amendment redefining a term previously construed indicates that "the judicial ... construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given the new term or phrase." 1A N. Singer, Sutherland Statutory Construction § 22.30, at 265 (Sands 4th ed. 1985); *see also id.* § 22.33, at 288. In 1987 the General Assembly put to rest our holding in *Associated Students* by amending the Open Meetings Law to include "all meetings of two or more members of the regents of the University of Colorado or any other governing board of a state institution of higher education referred to by the provisions of section 5 of article VIII of the state constitution or otherwise established by law." Ch. 166, sec. 1, § 24–6–402(1), 1987 Colo.Sess.Laws

926, 926 (currently codified at section 24–6–402(1), 10 C.R.S. (1987 Supp.)). Our holding in *Uberoi* met with an even quicker response from the General Assembly, when in 1985 it amended the definition of "institution" in the Open Records Act to expressly include "the University of Colorado, the regents thereof, and any other state institution of higher education or governing board referred to by the provisions of section 5 of article VIII of the state constitution." Ch. 208, sec. 1, § 24–72–202(1.5), 1985 Colo.Sess.Laws 867, 867 (currently codified at § 24–72–202(1.5), 10 C.R.S. (1987 Supp.)).

In 1979, when the General Assembly enacted 24–34–401(3), 10 C.R.S. (1982), it defined "employer" to include "the state of Colorado or any political subdivision, commission, department, institution, or school district thereof, and every other person employing persons within the state." Ch. 239, sec. 3, § 24–34–401(3), 1979 Colo.Sess.Laws 922, 929. This statutory definition is virtually all-inclusive in its scope and, when viewed in light of the definition of "person" in section 24–34–301(5), 10 C.R.S. (1982), is certainly far broader than the language of the Open Meetings Law construed in *Associated Students*,[4] and the language of the Public Records Act construed in *Uberoi*.[5] The General Assembly's decision to annul the holdings of *Associated Students* and *Uberoi* by broadening the scope of the Public Meetings Law and the Open Records Act to include the Regents is a clear signal that the legislative intent in using such generic terms as "institutions" and the even broader phrase "every other person employing persons within the state" in section 24–34–401(3), and in adopting a similarly expansive definition of person in section

**4.** The section of the Open Meetings Law at issue in *Associated Students* provided as follows:

All meetings of two or more members of any board, committee, commission, or other policy-making or rule-making body of any state agency or authority or of the general assembly at which any public business is discussed or at which any formal action may be taken by such board, committee, commission, or other policy-making or rule-making body are declared to be public meetings open to the public at all times, except as may be otherwise provided in the state constitution.

§ 24–6–402(1), 10 C.R.S. (1982).

**5.** The statutory definition of "public records" at issue in *Uberoi* provided as follows:

"Public records" means and includes all writings made, maintained, or kept by the state or any agency, institution, or political subdivision thereof for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds. It does not include criminal justice records which are subject to the provisions of part 3 of this article.

§ 24–72–202(6), 10 C.R.S. (1982).

24–34–301(5) ("one or more individuals, partnerships, associations, corporations, legal representatives, trustees, receivers, or the state of Colorado, and all political subdivisions and agencies thereof"), was to include the Regents within the definitions of "employer" for purposes of Colorado's employment practices legislation. *See, e.g., Town of the City of Champaign v. Overmeyer's, Inc.,* 18 Ill.App.2d 523, 152 N.E.2d 752 (1958) (presumption exists that legislature is familiar with prior court decisions construing statutory provisions; and when legislature amends statute, presumption is that legislature deliberately intended to change law); *State v. Beeman,* 315 N.W.2d .770 (Iowa 1982) (legislature presumed to know of prior judicial constructions of statutory provisions, and amendment changing term or phrase previously construed indicates that prior judicial construction did not correspond with legislative intent and different construction should be given amended term or phrase).

### B.

In *State Department of Institutions,* 185 Colo. 42, 521 P.2d 908, we held that the Commission had no jurisdiction to consider a complaint by a classified civil service employee who claimed that she was dismissed from state employment as a result of sex discrimination. We based our decision on the constitutional provision then in effect which gave exclusive jurisdiction to the Civil Service Commission to determine matters of employment and dismissal of classified civil servants. Colo. Const. art. XII, § 13 (repealed 1970 and reenacted with amendments 1971); *see also Civil Service Commission v. Hazlett,* 119 Colo. 173, 201 P.2d 616 (1948).

Unlike the constitutionally-created exclusivity of the Civil Service Commission's jurisdiction, the authority of the Regents is over "the general supervision" of the university "unless otherwise provided by law." Colo. Const. art. VIII, § 5(2). The general supervisory authority of the Regents, therefore, does not entail the kind of exclusive jurisdictional domain earmarked for the Civil Service Commission at the time this court decided *State Department of Institutions.* We therefore reject the Re-

gents' contention that that case is controlling of the issue before us in the present litigation.

### C.

In sum, the Regents' reliance on *Associated Students, Uberoi,* and *State Department of Institutions* proceeds from an attempt to draw a far more encompassing rule of institutional autonomy for the Regents than was either intended by those decisions or warranted by the particular circumstances in which those cases arose. Where, as here, a legislative scheme represents a social policy of such great statewide importance as the elimination of discriminatory practices in public and private employment, and where the General Assembly has evinced an unequivocal intent to include all governmental entities and private employers within its scope, the one limited exception being religious organizations not supported in whole or in part by tax revenues or public borrowing, we have no hesitation in concluding that the supervisory autonomy of the Regents must yield to the social policy inherent in the overriding legislative scheme and, as well, to the jurisdiction of that regulatory body which has been established for the specific purpose of effectuating the legislative goals which the statutory scheme was designed to achieve.

### IV.

Our holding in this case finds additional support in the Regents' law which expressly acknowledges that "[a]ll appointments ... shall be subject to the Constitution and Statutes of the state of Colorado." Laws of the Regents, art. X, § 1A(1) (June 1986). For purposes of interpretation, we view this enactment as we would a statute. In discerning the meaning of a statute, we look first to the legislative language, giving words and phrases their plain and ordinary meaning. *Colorado Common Cause v. Meyer,* 758 P.2d at 160; *Guenther,* 740 P.2d at 975. If the statutory language is plain, it should not be subjected to a strained interpretation or interpreted to mean that which it does not express. *E.g., Alonzi v. People,* 198 Colo. 160, 166, 597 P.2d 560, 564 (1979); *Rancho Colorado,*

*Inc. v. City of Broomfield,* 196 Colo. 444, 447, 586 P.2d 659, 661 (1978).

The Regents' law is an explicit acknowledgement that all appointments shall be subject to all provisions of the Colorado Constitution and all laws of the state, not merely some of them. Equality of treatment has long been recognized as an integral component of the Colorado Constitution, *e.g., Tassian v. People,* 731 P.2d 672 (Colo.1987); *Branson v. City and County of Denver,* 707 P.2d 338 (Colo.1985); *Stevenson v. Industrial Commission,* 190 Colo. 234, 545 P.2d 712 (1976), and is the underlying principle of Colorado's statutory scheme directed against discriminatory employment practices.

The judgment of the district court is reversed, and the case is remanded to that court with directions to return the case to the Commission for further proceedings consistent with the views herein expressed.