STUDENTS FOR CONCEALED CARRY ON CAMPUS, LLC, a Texas limited liability company; Martha Altman; Eric Mote; and John Davis, Plaintiffs–Appellants,

v.

The REGENTS OF the UNIVERSITY OF COLORADO; Stephen Ludwig, in his official capacity as Regent; Joseph Neguse, in his official capacity as Regent; Monisha Merchant, in her official capacity as Regent; Michael Carrigan, in his official capacity as Regent; Tom Lucero, in his official capacity as Regent; Steve Bosley, in his official capacity as Regent; Kyle Hybl, in his official capacity as Regent; James Geddes, in his official capacity as Regent; Tilman Bishop, in his official capacity as Regent; Jim Spice, in his official capacity as Chief of Campus Police, University of Colorado at Colorado Springs; Pam Shockley–Zalabak, in her official capacity as Chancellor, University of Colorado at Colorado Springs; Doug Abraham, in his official capacity as Chief of Campus Police, University of Colorado Denver; and M. Roy Wilson, in his official capacity as Chancellor, University of Colorado Denver, Defendants–Appellees.

No. 09CA1230.

Colorado Court of Appeals,
Div. I.

April 15, 2010.

James M. Manley, Lakewood, CO, for Plaintiffs–Appellants.

Patrick T. O'Rourke, Margaret Wilensky, Denver, CO, for Defendants–Appellees.

Isaacson Rosenbaum P.C., Edward T. Ramey, Denver, CO, for Amicus Curiae Brady Center to Prevent Gun Violence.

Opinion by Judge HAWTHORNE.

Plaintiffs, Students for Concealed Carry on Campus, Martha Altman, Eric Mote, and John Davis, appeal the trial court's judgment dismissing their claims against defendants, the Board of Regents, individual Regents, Chiefs of Police, and Chancellors of the University of Colorado (collectively Regents), under C.R.C.P. 12(b)(5). We reverse and remand for further proceedings.

In this case of first impression, we consider whether the Concealed Carry Act (CCA), sections 18–12–201 to –216, C.R.S.2009, applies to universities. Because the statute expressly applies to "all areas of the state," we conclude that plaintiffs have stated a claim for relief under the CCA. We further conclude that plaintiffs have stated a claim for relief under Colorado Constitution article II, section 13, which affords individuals the right to bear arms in self-defense.

### I. Facts and Procedural History

The Regents enacted the Weapons Control Policy 14–I (the policy), which prohibits "the possession of firearms or other dangerous or illegal weapons on or within any University of Colorado campus, leased building, other area under the jurisdiction of the local campus police department or areas where such possession interferes with the learning and working environment." It permits possession of firearms or other dangerous weapons "for peace officers or others who have written permission from the Chief of Police ... or from the Chancellor after consultation with the Chief of Police." Additionally, "[f]irearm storage may be provided by campus police as a service to students or employees residing in campus housing."

An individual found to have intentionally or recklessly used or possessed a firearm or weapon in a way that would intimidate, harass, injure, or otherwise interfere with the learning and working environment, "shall be banned from the University campus, leased building, or other area under the control of University campus police." The minimum disciplinary sanction for a student is expulsion and for an employee, termination of employment.

The Regents included the following justifications within the policy:

- The possession of firearms, explosives, and other dangerous or illegal weapons on or within any University of Colorado campus, leased building, areas under the local campus police department's jurisdiction or areas where such possession interferes with the learning and working environment is inconsistent with the University's academic mission, and seriously undermines it;

- "[Possession of firearms and other dangerous weapons] threatens the tranquility of the educational environment in an intimidating way and it contributes in an offensive manner to an unacceptable climate of violence"; and

- The University's "educational mission should attempt to teach and model those values which are held to be important to the nation as a whole."

Plaintiffs filed a complaint alleging that the policy violates the CCA and the Colorado Constitution's Right to Keep and Bear Arms Clause. *See* §§ 18–12–201 to –216; Colo. Const. art. II, § 13. The complaint alleged the following:

- Plaintiffs Altman, Davis, and Mote have met all of section 18–12–203's requirements, have no history of substance abuse or criminal activity, have demonstrated competency with a handgun, and are not subject to a protection order;

- The Auraria Campus Police Department's 2007 Campus Security and Safety Report indicates that since 2005, nearly a dozen forcible sexual assaults and almost fifty robberies and aggravated assaults have occurred on or near the Auraria campus, where the University of Colorado at Denver is located;

- Plaintiffs Altman, Davis, and Mote intend to possess a handgun when traveling to, from, through, or on the campuses of the University of Colorado for self-defense, but are prevented from doing so by the Regents' enforcement of the policy;

- Plaintiffs Altman, Davis, and Mote were all denied permission to carry a concealed handgun on campus;

- The policy denies campus visitors the right to bear arms in self-defense, including prohibiting possession of firearms safely stored in vehicles that are parked on or driven through campus; and

- The policy "is an unreasonable regulation of the right to keep and bear arms" and therefore violates the Colorado Constitution.

The trial court concluded that plaintiffs failed to state a claim, and therefore granted the Regents' Rule 12(b)(5) motion to dismiss. Plaintiffs appeal.

## II. Standard of Review

■ We review de novo a trial court's order granting a motion to dismiss, accept all factual averments as true, and view the complaint's allegations most favorably to the plaintiff. *Lobato v. State*, 218 P.3d 358, 367 (Colo.2009); *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 71 (Colo.2004). A motion to dismiss for failure to state a claim tests the complaint's sufficiency. C.R.C.P. 12(b)(5); *Lobato*, 218 P.3d at 367. A court cannot grant a motion to dismiss for failure to state a claim unless no set of facts can prove that the plaintiff is entitled to relief. *Lobato*, 218 P.3d at 367.

## III. Analysis

### A. CCA Claim

Plaintiffs contend the trial court erred in ruling that their complaint failed to state a claim for relief under the CCA. We agree.

■ In construing statutes, courts seek to effectuate the General Assembly's purpose and intent. *Askew v. Indus. Claim Appeals Office*, 927 P.2d 1333, 1337 (Colo.1996). In interpreting a comprehensive legislative scheme, we give meaning to all portions thereof and construe statutory provisions to further the legislative intent. *A.B. Hirschfeld Press, Inc. v. City & County of Denver*, 806 P.2d 917, 920 (Colo.1991). We look first to the statutory language, giving words and phrases their commonly accepted and understood meaning. *Askew*, 927 P.2d at 1337. If the statutory language is unambiguous, we need not resort to interpretive statutory construction rules because we presume that the

General Assembly meant what it clearly said. *Id.* Where the statute's language is plain and clear, we must apply the statute as written. *In re 2000–2001 Dist. Grand Jury*, 97 P.3d 921, 924 (Colo.2004).

With these principles in mind, we turn to the CCA's text. The CCA "provide[s] statewide uniform standards for issuing permits to carry concealed handguns for self-defense" and mandatory procedures for sheriffs to follow in issuing permits. § 18–12–201(2)(b), (3); *see* § 18–12–203 (criteria for obtaining a permit); § 18–12–204 (permit contents, validity, and carrying requirements); § 18–12–205 (application procedure); § 18–12–206 (issuance and denial of permits and reports); § 18–12–207 (judicial review of sheriff's decision); § 18–12–208 (Colorado Bureau of Investigation's duties); § 18–12–209 (temporary emergency permits); § 18–12–210 (permit maintenance, address change, permit invalidity); § 18–12–211 (permit renewal process); § 18–12–212 (exemption for foreign jurisdictions); § 18–12–213 (reciprocity); § 18–12–214 (authority granted by permit and carrying restrictions); § 18–12–215 (immunity); § 18–12–216 (permits issued prior to May 17, 2003).

In enacting the CCA, the General Assembly declared the following:

- There exists a widespread inconsistency among jurisdictions within the state with regard to . . . identification of areas of the state where it is lawful to carry concealed handguns;

- This inconsistency among jurisdictions creates public uncertainty regarding the areas of the state in which it is lawful to carry concealed handguns;

- The criteria and procedures for the lawful carrying of concealed handguns historically ha[ve] been regulated by state statute and should be consistent throughout the state to ensure the consistent implementation of state law;

- It is necessary that the state occupy the field of regulation of the bearing of concealed handguns since the issuance of a concealed handgun permit is based on a person's constitutional right of self-protection and there is a prevailing state

interest in ensuring that no citizen is arbitrarily denied a concealed handgun permit and in ensuring that the laws controlling the use of the permit are consistent throughout the state.

§ 18–12–201(1)(a)–(b), (d)-(e).

Based on these findings, the General Assembly concluded, "The ... carrying of concealed handguns is a matter of statewide concern." § 18–12–201(2)(a). Section 18–12–201 thus reflects the legislature's intent to create uniform statewide standards concerning the carrying of concealed weapons.

Section 18–12–214(1)(a) provides:

A permit to carry a concealed handgun *authorizes the permittee to carry a concealed handgun in all areas of the state, except as specifically limited in this section.* A permit does not authorize the permittee to use a handgun in a manner that would violate a provision of state law. A local government does not have authority to adopt or enforce an ordinance or resolution that would conflict with any provision of this part 2.

(Emphasis added.)

A concealed carry permit does not authorize the permittee to carry a concealed weapon in the following areas specifically enumerated in section 18–12–214:

- "a place where the carrying of firearms is prohibited by federal law";
- "the real property, or into any improvements erected thereon, of a public elementary, middle, junior high, or high school";
- "a public building at which:

  (a) Security personnel and electronic weapons screening devices are permanently in place at each entrance to the building;

  (b) Security personnel electronically screen each person who enters the building to determine whether the person is carrying a weapon of any kind; and

  (c) Security personnel require each person who is carrying a weapon of any kind to leave the weapon in possession of security personnel while the person is in the building."

- "Nothing ... shall be construed to limit, restrict, or prohibit in any manner the existing rights of a private property owner, private tenant, private employer, or private business entity."

§ 18–12–214(3)–(5).

■ The statute's plain language applies to "all areas of the state" and does not specify public universities in its list of exceptions. § 18–12–214. Had the legislature intended to exempt universities, it knew how to do so. *Cf.* § 18–12–105.5, C.R.S.2009 (unlawfully possessing a deadly weapon on "any public or private elementary, middle, junior high, high, or vocational school or any public or private college, university, or seminary" is a class six felony unless "[t]he weapon is unloaded and remains inside a motor vehicle while upon the real estate of any public or private college, university, or seminary" or the person holds a valid concealed carry permit).

The Regents maintain that they are not "a local government," but rather an "arm of the state." *See Hartman v. Regents of University of Colorado,* 22 P.3d 524, 528 (Colo.App. 2000) (for Eleventh Amendment immunity purposes, the University is "an arm of the state"), *aff'd sub nom. Middleton v. Hartman,* 45 P.3d 721 (Colo.2002). They argue the statutory language providing that "a local government does not have authority to adopt or enforce an ordinance or resolution that would conflict with any provision of [the CCA]," does not apply to them. *See* § 18–12–214(1)(a); *see also Hartman,* 22 P.3d at 528. Thus, the Regents contend they are not statutorily restricted from adopting the policy. We are not persuaded.

The CCA prohibits local governments from adopting or enforcing regulations that conflict with the CCA. § 18–12–214(1)(a). However, the prohibition on local governments adopting or enforcing regulations does not necessarily mean that the statute authorizes an entity other than a local government to enact regulations that conflict with the CCA. The Regents' argument rests on the logical fallacy of assuming that the inverse of a proposition is true. *See Capitol Records, Inc. v. Naxos of America, Inc.,* 372 F.3d 471,

480 (2d Cir.2004) (the inverse of a valid proposition is not necessarily true).

Moreover, the statute's plain language does not support the Regents' argument. The prohibition on local governments adopting or enforcing ordinances that conflict with the CCA appears in the same subsection that authorizes a permittee to carry a concealed handgun in "all areas of the state, except as specifically limited in this section." § 18–12–214(1)(a); *see* § 18–12–214(3)–(5) (excepting places where carrying of firearms is prohibited by federal law; public elementary, middle, junior high, or high schools; public buildings with electronic screening devices and security personnel; and private property). Furthermore, the Regents' position does not comport with the legislature's intent to have the "state occupy the field of regulation of the bearing of concealed handguns" and "ensur[e] that the laws controlling the use of the permit are consistent throughout the state." § 18–12–201(1)(e).

Nevertheless, the Regents maintain that their constitutional and statutory power to regulate the University permits them to implement the policy because the CCA did not expressly divest them of their regulatory authority. The Colorado Constitution provides that state institutions of higher education, which include "[t]he university at Boulder, Colorado Springs, and Denver," shall be established and managed "subject to the control of the state, under the provisions of the constitution and such laws and regulations as the general assembly may provide." Colo. Const. art. VIII, § 5(1). Article IX, section 12 establishes "The Regents of the University of Colorado" as "a body corporate." Article VIII, section 5(2) discusses the extent of the Regents' authority:

> The governing boards of the state institutions of higher education, whether established by this constitution or by law, shall have the general supervision of their respective institutions and the exclusive control and direction of all funds of and appropriations to their respective institutions, unless otherwise provided by law.

Section 23–5–106(1), C.R.S.2009, provides, "The governing board of any state institution of higher education has the authority to promulgate rules and regulations for the safety and welfare of students, employees, and property, [and] to promulgate rules and regulations necessary for the governance of the respective institutions...."

Relying on *Associated Students of University of Colorado v. Regents of University of Colorado,* 189 Colo. 482, 543 P.2d 59 (1975), and *Uberoi v. University of Colorado,* 686 P.2d 785 (Colo.1984), the Regents argue that the CCA does not apply to the University because the statute does not expressly divest them of their constitutional and statutory authority to regulate the University. Again, we are unpersuaded.

■ The CCA is intended to address "a widespread inconsistency among jurisdictions within the state with regard to ... identification of areas of the state where it is lawful to carry concealed handguns." § 18–12–201(1)(a). The General Assembly declared, "The criteria and procedures for the lawful carrying of concealed handguns historically has been regulated by state statute and should be consistent throughout the state to ensure the consistent implementation of state law ...." § 18–12–201(1)(d). The legislature also determined, "It is necessary that the state occupy the field of regulation of the bearing of concealed handguns ...." § 18–12–201(1)(e). The General Assembly thus enacted a broad statutory scheme directed toward creating uniform standards for carrying concealed handguns. *See Copley v. Robinson,* 224 P.3d 431, 434 (Colo.App.2009) ("the General Assembly's legislative declaration indicates that the purpose of enacting the new concealed handgun law was to provide for uniform, state-wide administration and standards in the consideration of applications for concealed handgun permits").

As with their "local government" argument, the Regents' "express divestiture" argument is undermined by section 18–12–214, which reflects the legislature's intent to subject "all areas of the state," except those specifically enumerated, to uniform regulation of concealed handgun carry. § 18–12–214(1)(a), (2)-(5); *see Colorado Civil Rights Comm'n ex rel. Ramos v. Regents of University of Colorado,* 759 P.2d 726, 731 (Colo. 1988) (§ 24–34–401 reflects the legislature's

intent to subject the Regents to the Civil Rights Commission's jurisdiction even though the Regents had not been expressly included in the statute). Had the legislature intended to exclude universities from regulation under the CCA, it could have included them among the specific exceptions in section 18–12–214(3). *See Ramos,* 759 P.2d at 732 ("It would make little sense for the General Assembly to ... expressly exclude from the definition [of employer] certain religious organizations and associations but no other category of employer and yet not to have intended that the Regents ... be subject to the statutory prohibition against discriminatory employment practices." (citation omitted) ).

Furthermore, the legislation at issue in *Associated Students* and *Uberoi* is distinguishable from the CCA. In *Associated Students,* the Colorado Supreme Court considered whether the Open Meetings Law, §§ 24–6–401 and –402, C.R.S.1982, was applicable to the Regents' executive sessions, which were closed to the public. 189 Colo. 482, 543 P.2d 59. The Open Meetings Law required that all meetings of any "policy-making or rule-making body of any state agency or authority" be open to the public at all times, "except as may be otherwise provided in the state constitution." *Id.* at 484, 543 P.2d at 60. As the *Ramos* court observed, the Open Meetings Law at issue in *Associated Students* expressly qualified the statute's scope by stating that the statute was applicable "except as may be otherwise provided in the state constitution," and only to policy-making or rulemaking bodies of any state agency or the General Assembly. 759 P.2d at 733.

*Uberoi* concerned the Open Records Act's applicability to the Regents. 686 P.2d 785. There, the Colorado Supreme Court again emphasized that the Open Records Act was qualified by the constitutional phrase "except ... as otherwise specifically provided by law." *Id.* at 788. Unlike the Open Meetings Law and the Open Records Act, the CCA contains no qualifying language directing that other constitutional or statutory provisions supersede its statutory scheme. *See Ramos,* 759 P.2d at 733.

Finally, the Regents' contention that, as an arm of the state, they are exempt from legislation unless expressly included "would result in forcing article VIII, section 5(2) of the Colorado Constitution into the unintended service of granting the Regents immunity" from legislation unless a statute expressly and unequivocally provides that it applies to the University. *Ramos,* 759 P.2d at 732. The Colorado Supreme Court rejected this "express divestiture" argument in *Ramos. See id.* at 730–33. We therefore conclude that the CCA satisfies the "unless otherwise required by law" provision of article VIII, section 5(2) of the Colorado Constitution by "manifesting a clear and unmistakable intent to subject" the entire state to a single statutory scheme regulating concealed handgun carry, subject to specified exceptions. *See id.* at 732–33.

Thus, we conclude plaintiffs' allegations that the individual students have met the CCA's permit requirements, when accepted as true, state a claim for relief that the policy violates the CCA.

Concealed carry and weapons possession on college campuses have been the subject of scholarly and public debate. *See, e.g.,* David B. Kopel, *Pretend "Gun-free" School Zones: A Deadly Legal Fiction,* 42 Conn. L.Rev. 515 (2009); Brian J. Siebel, Allen K. Rostron, Doug Pennington, Sally L. Walker, Graham Steele, Jennifer Steinberg, Patricia A. Taylor, Susan Campbell & Elizabeth Dillinger, *No Gun Left Behind: The Gun Lobby's Campaign to Push Guns into Colleges and Schools* (Brady Center to Prevent Gun Violence May 2007), *available at* www.bradycenter.org. However, we express no opinion concerning this debate because "courts do not approve or disapprove the wisdom ... or the desirability of legislative acts." *Colorado Office of Consumer Counsel v. Public Utilities Comm'n,* 42 P.3d 23, 28–29 (Colo.2002) (quoting *Kallenberger v. Buchanan,* 649 P.2d 314, 318 (Colo.1982)); *see also Dep't of Transp. v. City of Idaho Springs,* 192 P.3d 490, 494 (Colo.App.2008) (courts may not rewrite statutes).

## B. Constitutional Claim

Plaintiffs also contend the district court erred in dismissing their constitutional claim because it failed to state a claim for relief. We agree.

Plaintiffs argue that the policy is an unreasonable restriction on their right to bear arms in self-defense. At oral arguments, plaintiffs narrowed their constitutional claim's scope to the ability to possess a firearm in a motor vehicle when traveling on or through a University of Colorado campus.

Article II, section 13 provides, "The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons." Plaintiffs allege that the policy violates their constitutional right to bear arms in self-defense and "is an unreasonable regulation of the right to keep and bear arms."

Relying on *Trinen v. City & County of Denver*, 53 P.3d 754, 757 (Colo.App.2002), the district court applied the rational basis test and determined that the policy's declaration of intent reasonably supported the policy. In *Trinen*, another division of this court interpreted the Colorado Supreme Court's decision in *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo.1994), and stated:

> In *Robertson*, the supreme court did not expressly state whether the right to bear arms is a fundamental right. However, by requiring that restrictions on the right be only reasonable, rather than necessary, the court essentially applied the rational basis test in evaluating the constitutionality of a city ordinance that implicated the right to bear arms.

53 P.3d at 757 (citation omitted).

*Trinen* cited *People v. Young*, in which the Colorado Supreme Court stated, "when no fundamental right is implicated, the legislation is subject to evaluation for substantive due process purposes pursuant to the rational basis test, requiring the state to demonstrate that the legislation bears some reasonable relationship to a legitimate governmental interest." 859 P.2d 814, 818 (Colo.1993). The *Young* court rejected the defendant's equal protection challenge because he failed to show that identical criminal conduct was punishable by different criminal sanctions. *Id.* at 817. The court also rejected defendant's substantive due process claim after applying rational basis review. *Id.* at 818.

To the extent *Trinen* indicates that the *Robertson* court impliedly adopted rational basis review, we disagree. *See Am. Family Mut. Ins. Co. v. Murakami*, 169 P.3d 192, 193 (Colo.App.2007) (one division of the court of appeals is not bound by the decision of another division). The Robertson court repeatedly emphasized that it did not need to decide whether the right to bear arms in self-defense is a fundamental right. *Robertson*, 874 P.2d at 335. The majority noted that the right to bear arms in self-defense "is an important constitutional right ... [but] this case does not require us to determine whether that right is fundamental." *Id.* at 328. The concurring opinion also recognized that "[w]here a fundamental right is not involved, a legislative enactment is tested under the rational basis test which requires the government to show that the ordinance is rationally related to a legitimate state interest." *Id.* at 340–41 (Vollack, J., concurring). Thus, the court was well aware that the rational basis test existed. However, the court explicitly declined to reach the issue of whether article II, section 13 affords a fundamental right and applied a "reasonable exercise" test similar to those adopted by other states, which allows the government to "impose *reasonable* regulations over the constitutional right to bear arms in order to promote safety and welfare." *Id.* at 342 (Vollack, J., concurring) (emphasis added); *see also* Adam Winkler, *The Reasonable Right to Bear Arms*, 17 Stan. L. & Pol'y Rev. 597, 598 (2006) (state courts have uniformly applied a "deferential 'reasonable regulation' standard to laws infringing on the arms right" and "under this standard, the vast majority of gun control regulations are upheld"; however, laws "found to be arbitrary or to amount to a complete denial of the right to bear arms have been invalidated").

Rational basis review traditionally applies where a statutory classification involves neither a fundamental right nor a suspect class. *Hurricane v. Kanover, Ltd.,* 651 P.2d 1218, 1222 (Colo.1982). Legislation survives rational basis review if it rationally furthers a legitimate state purpose. *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 618, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Scholz v. Metropolitan Pathologists, P.C.,* 851 P.2d 901, 906 (Colo.1993) ("a statute will not be found to violate equal protection guarantees so long as it is reasonable and bears a rational relationship to a legitimate state objective"). This review standard is distinguishable from the reasonable exercise test announced in *Robertson.*

Rational basis is the least intrusive review standard and provides a presumption of constitutionality. *See FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Pace Membership Warehouse v. Axelson,* 938 P.2d 504, 506 (Colo.1997) ("a statutory classification is presumed constitutional and does not violate equal protection unless it is proven beyond a reasonable doubt that the classification does not bear a rational relationship to a legitimate legislative purpose"). Those attacking the legislation's rationality bear the burden "to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (quoting *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940)). A reviewing court asks only whether it is conceivable that the governmental regulation bears a rational relationship to an end of government which is not constitutionally prohibited. *Pace Membership Warehouse,* 938 P.2d at 507 ("[a] statute can only be stricken under the rational basis standard if there exists no reasonably conceivable set of facts to establish a rational relationship between the statute and a legitimate governmental purpose"); *see also Beach Commc'ns,* 508 U.S. at 313–14, 113 S.Ct. 2096 (in equal protection context, rational basis review is a "paradigm of judicial restraint": "Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" (quoting *United States Railroad Retirement Bd. v.*

*Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980))). The government's stated objectives must be considered the true objectives even if they were not stated when the action was taken. *See Hooper,* 472 U.S. at 619, 105 S.Ct. 2862 (noting one of state's asserted objectives was "refined" during litigation). Furthermore, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns,* 508 U.S. at 315, 113 S.Ct. 2096.

Rather, when applying rational basis review, the court determines whether the government's chosen means were rationally related to furthering a legitimate governmental purpose. *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 671–72, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); *Scholz,* 851 P.2d at 906. In making such a determination, the court may not weigh alternatives available to the government. *Schweiker v. Wilson,* 450 U.S. 221, 235, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (as long as the legislative scheme chosen "rationally advances a reasonable and identifiable governmental objective, [the court] must disregard the existence of other methods of allocation"). In reviewing equal protection challenges, the court does not second-guess the government's choice, even if better or more efficient means were available. *Beach Commc'ns,* 508 U.S. at 315, 113 S.Ct. 2096.

In contrast, laws that impinge on constitutionally protected personal rights are subject to strict scrutiny and will be sustained only if they are narrowly tailored to serve a compelling state interest. *See Mayo v. Nat'l Farmers Union Prop. & Cas. Co.,* 833 P.2d 54, 58 (Colo.1992) (strict scrutiny applies to fundamental rights and suspect classifications); *see also Sable Commc'ns of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (sexual expression which is indecent but not obscene is protected by the First Amendment). This review standard is "the most exacting." *In re Adoption of T.K.J.,* 931 P.2d 488, 495 (Colo.App.1996). Strict scrutiny places the burden on the government to show that the

statute is supported by a compelling state interest and that it is narrowly drawn to achieve that interest in the least restrictive manner possible. *Id.; United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (to survive strict scrutiny, there cannot be any less restrictive means to effectuate the legislature's purpose). When a plausible, less restrictive alternative is offered, the government bears the burden of proving that the alternative will be ineffective to achieve its goals. *Id.*

Avoiding either rational basis or strict scrutiny review, the *Robertson* court stated that the test for reviewing article II, section 13 challenges "is whether the law at issue constitutes a reasonable exercise of the state's police power," and "[a]n act is within the state's police power if it is reasonably related to a legitimate governmental interest such as the public health, safety, or welfare." *Robertson,* 874 P.2d at 329, 331. The court did not explicitly adopt rational basis review, nor did it include any language approving the extremely deferential presumptions which traditionally attach to it. In concluding that Denver's assault rifle ban did not impermissibly infringe on the right to bear arms, the court explained that the city banned possession and use of only about 40 firearm types out of 2,000 possible types available for purchase and use in the United States. *Id.* at 333. Although the statute limited the way in which the right to bear arms could be exercised, the ordinance did not significantly interfere with the right to bear arms because "there [were] ample weapons available for citizens to fully exercise their right to bear arms in self-defense." *Id.*

The "reasonable exercise" test applied in *Robertson* comports with other Colorado cases reviewing gun regulation, none of which impliedly or explicitly adopted rational basis review. In *City of Lakewood v. Pillow,* 180 Colo. 20, 23, 501 P.2d 744, 745 (1972), the Colorado Supreme Court invalidated a local ordinance prohibiting possessing, using, or carrying all firearms types outside one's home because the ordinance was overly broad and even prohibited an individual from transporting a weapon from a gun store to his or her home. The court stated:

> A governmental purpose to control or prevent certain activities, which may be constitutionally subject to ... regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

*Id.* at 745 (citations omitted).

In *People v. Blue,* 190 Colo. 95, 99, 544 P.2d 385, 387 (1975), our supreme court held that a statute prohibiting prior offenders from possessing weapons was a constitutional exercise of the police power. The court noted that the state legislature cannot enact laws which render constitutional rights nugatory, but concluded that the statute did not attempt to subvert article II, section 13's intent. *Id.* at 103, 544 P.2d at 391.

■■■ Rational basis review and the reasonable exercise test are distinguishable. The reasonable exercise test "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *Bleiler v. Chief,* 155 N.H. 693, 927 A.2d 1216, 1223 (2007) (quoting *State v. Cole,* 264 Wis.2d 520, 665 N.W.2d 328, 338 (2003)) (applying reasonableness test, not strict scrutiny, to substantive due process challenge to statute governing suspension and revocation of concealed carry licenses).

■■■ Moreover, whether challenged legislation bears a rational relationship to a legitimate governmental interest is a legal question. *People v. Zinn,* 843 P.2d 1351, 1354 (Colo.1993). In contrast, whether challenged legislation is a reasonable exercise of the state's police power is a mixed factual and legal question. *See Robertson,* 874 P.2d at 332–33 ("the evidence presented to the trial court clearly showed that the ordinance is reasonably related to [crime prevention]"; "the evidence plainly shows[ ] there are am-

ple weapons available for citizens to fully exercise their right to bear arms in self-defense"; thus, "the evidence ... undeniably demonstrates that the ordinance is reasonably related to a legitimate governmental interest and constitutes a valid exercise of the state's police power on the right to bear arms in self-defense").

Based on these precedents, we conclude that the reasonable exercise test applied in *Robertson,* not the rational basis test, is the appropriate test for evaluating article II, section 13 challenges. Although we express no opinion about the merits, we thus conclude that plaintiffs' allegations that the policy unreasonably infringes on their right to bear arms in self-defense under article II, section 13 states a claim for relief concerning the ability to carry a firearm in a motor vehicle when traveling on or through a University of Colorado campus.

The judgment is reversed and the case remanded for reinstatement of plaintiffs' claims and further proceedings consistent with this opinion.

Judge TAUBMAN and Judge STERNBERG *, concur.