Bergan, J.
The interdiction of discrimination in civil rights based on race or creed is a fundamental public policy of New York, articulated in both the constitutional and the statutory law of the State. The controversy in this case arises from a *145 dispute between two public authorities as to which shall have the right to enforce the law against discrimination in employment in the public schools.
The Commission for Human Eights asserts its jurisdiction over enforcement in this area generally; the Board of Higher Education of the City of New York asserts its exclusive right of enforcement in those public educational institutions within its control and argues that enforcement in the public schools generally lies only within the jurisdiction of the Regents and the State Commissioner of Education.
Whichever of these agencies performs the task of enforcement, we hold no doubt it will be faithfully and impartially executed. The problem involves a search of the wellsprings of power which underlie the jurisdiction of the two competing public authorities; and the choice between them must, in the end, depend on the way a statute is to be read.
The statute itself (Executive Law, art. 15, the Law Against Discrimination [L. 1945, eh. 118]) carries out a constitutional provision proposed by the Convention of 1938, which prohibits discrimination in civil rights ‘ ‘ because of race, color, creed or religion ”. That prohibition attaches to “ the state or any agency or subdivision of the state ” (N. Y. Const., art. I, § 11).
The Law Against Discrimination establishes the respondent Commission for Human Eights (Executive Law, § 290), formerly, and at the time this proceeding was instituted, called the Commission against Discrimination. Its power over the subject of discrimination prohibited by the Constitution is cast in broad terms and in language quite plenary in its sweep.
The commission shall have “power”, runs the statutory text, “ to eliminate and prevent discrimination in employment ” and in other stated subjects; “ and the commission established hereunder is hereby given general jurisdiction and power for such purposes” (§ 290). The purpose of the statute is “in fulfillment of the provisions of the constitution of this state concerning civil rights ” (§ 290).
If the constitutional interdiction of discrimination in, civil rights by the State or any State agency or subdivision be kept in mind and read with the provisions of section 291 of the statute which declares the opportunity for employment “ without discrimination because of race, creed, color or national *146 origin ” is “ a civil right ”, it becomes clear that the “ general jurisdiction and power ” of the commission to “ eliminate and prevent discrimination in employment ” attaches to all public agencies; and it would be reasonable to expect that all public agencies would yield readily to a legislative policy thus distinctly laid down.
The petitioner Board of Higher Education of the City of New York is a public agency created by the Legislature to administer that part of the city school system which is of collegiate grade and such units are made part of the common school system. (Education Law, §§ 6201, 6202.) Its administration of the city colleges is a State function and the board itself is a State agency. (Metzger v. Swift, 258 N. Y. 440; Nelson v. Board of Higher Educ. of City of N. Y., 263 App. Div. 144, affd. 288 N. Y. 649.)
The board submits that the subject of discrimination because of race or creed in its employment practices is outside the ‘ ‘ general jurisdiction and power ’ ’ of the commission. Based on a reading of the definitions set out in section 292 of the statute, its main argument is that the “Board is not an ‘ employer ’ under the applicable law; hence the Commission has no jurisdiction over the Board ”.
This point becomes the keystone of the board’s contention. The pertinent statutory language appearing in section 292, headed “ Definitions ”, is in paragraph 5, which reads this way: ‘ ‘ 5. The term ‘ employer ’ does not include a club exclusively social, or a fraternal, charitable, educational or religious association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ.”
The Board of Higher Education of the City of New York does not fit readily, or at all, into this exclusory list of who is not an “employer”. All are private organisms and none public agencies.
The meaning of “ educational ” is affected by the contextual adjectives which run with it, i.e., “ fraternal ”, “ charitable ” and ‘ ‘ religious ’ ’, which could sensibly apply only to private, and not to public agencies. 'Such terms as these, used together, serve to limit the sense in which “educational” serves the text. (United States v. Baumgartner, 259 F. 722, 724.)
*147 The term “ not organized for private profit ”, which modifies the list in its entirety, could not apply to the Board of Higher Education or to the public school system which under no conceivable circumstances could be thought to be “ organized ” for a ‘[1] private profit ’ ’. The list of exclusion must relate, then, to privately organized educational corporations from which no profit was intended in their organization.
The Law Against Discrimination was recommended to the Legislature by the New York State Temporary Commission against Discrimination, an agency created by chapter 692 of the Laws of 1944, in a report which contained the proposed statutory text and a study of the problem of discrimination and its background (N. Y. Legis. Doc., 1945, No. 6).
The comment of the Temporary Commission on the scope of the word ‘ ‘ employer ’ ’ used in the statute suggests that it was intended to be read to include public employment. The report noted that “ We have found no definition of the word ' employer ’ as clear and comprehensive as the word itself in its accepted and dictionary meaning ” (supra, p. 28). It was concluded, in view of the constitutional mandate, that “employment by government is covered” (p. 28).
If the Board of Higher Education is right in believing that the Legislature intended to carve it out, in particular, and other public school agencies as well, from the area of the commission’s general power to deal with constitutionally prohibited discrimination, it would be unlikely that the statutory draftsmen would attempt to achieve this purpose by defining the Board of Higher Education out of being an “ employer Government “is covered” within the word “employer” as the report noted (N. Y. Legis. Doc., 1945, No. 6, supra, p. 28).
It could, of course, readily have been provided that jurisdiction to enforce the constitutional mandate would be vested only in the Regents or the State Commissioner of Education, and thus exempt the board from the general jurisdiction of the commission.
That would have been the normal way to do this. But with a constitutional prohibition against discrimination affecting the Board of Higher Education as well as all other public agencies of the State, it would be unlikely that the Legislature in dealing with discrimination would have withdrawn the board *148 or the public schools from the authority of the commission by so awkward and inconsistent a mechanism as providing that in respect of their personnel they were not ‘ ‘ employers ’
Here, unlike the assortment of private groups, such as fraternal and religious, with which the board seeks to identify itself, the term ‘ ‘ civil rights ’ ’ in the sense used in the Constitution has particular pertinency to public employment. We are of opinion that the definitions set up by subdivision 5 of section 292 do not effectively take petitioner away from the general jurisdiction of the commission.
The board and some of the amici briefs suggest that the Temporary Commission which prepared the law intended that the school authorities should have exclusive jurisdiction to prevent discrimination in employment in the public school system. A section of its report is devoted to education (N. Y. Legis. Doc., 1945, No. 6, supra, pp. 40-47) and sets out the powers of the Board of Regents and the State Department of Education over public and other education (N. Y. Const., art. V, §§ 2, 4; art. XI, § 2; former Education Law, §§ 20, 46, 94, 95, 96).
The report in this section states:
“ Hence, the Board of Regents and the Department of Education are unique in that they possess administrative, executive, legislative, and judicial power over ‘ all of the educational work of the state. ’ Thus they constitute in the field of education an existing state agency, created by Constitution and statute, with power:
“1. To enforce all laws against discrimination in the school system on account of race, creed, color or national origin; [p. 41]
*4L 41, w w
“ Thus, the Board of Regents and the Commissioner of Education are already possessed of full power to outlaw and relieve against discrimination in the opportunities and benefits of the educational system of the state and in employment therein. No additional legislative authority for such a purpose seems necessary, [p. 42]
# * *
“ Our conclusions, therefore, are that the school authorities do not need more law either to suppress discrimination in the *149 school system itself or to set up educational policies and programs against those prejudices which produce discrimination and its disastrous consequences.” (p. 47)
The report does not say explicitly that the new commission is to he excluded from the field of employment of personnel in public education; and two considerations lead us to think it did not intend such exclusion.
One is the whole section of the report dealing with education seen in full context; the other is the terms of the statute itself which accompanied the report, and which, as we have suggested, ought not to be read intrinsically as excluding the Commission for Human Eights from the area of discrimination in employment practices in public education.
In the opening paragraphs of the section of the report dealing with education (N. Y. Legis. Doc., 1945, No. 6, supra, p. 40), the role of the Commission for Human Eights in relation to education is outlined. It is stated:
‘ ‘ The bill for a state agency expressly provides for invoking the assistance of that community good-will which is the product of all those constructive processes associated with education in the broad sense. The bill expressly authorizes the state agency to study the problems of discrimination ‘ in all or specific fields of human relationships, ’ to marshal the local resources for cooperation and conciliation, to distribute information pro-motive of better human attitudes, to make recommendations to and obtain cooperation from all ‘ agencies and officers of the state or local subdivisions of government, ’ and to commend to the appropriate state agency programs for formal and informal education against prejudice and discrimination.
“ Chief among these agencies of government is the great Department of Education.”
This means, certainly, that the proponents of the statute were of opinion that the Commission for Human Eights had indeed a dynamic part to play in the elimination of discrimination in public education. The term ‘ ‘ state agency ’ ’ as used here could apply to the commission and to nothing else.
This is the agency “ for invoking the assistance of that community good-will”; to “study”, to “marshal”, to “distribute ”, to “ make recommendations ” and, finally, to “ obtain cooperation from * all agencies and officers of the state ’ ”. It *150 seems of significance that “ Chief among these agencies from which the commission is to “ obtain cooperation ” is the State Department of Education.
A report cast in these terms, and recommending a statute granting the new commission “ general jurisdiction and power ” for the purposes of eliminating discrimination in public employment, cannot easily be read as intending to exclude the field of public education.
It is with this contextual language of the report and the language of the statute in mind that we must read the comment that the Regents and the Department of Education have existing power to enforce laws against discrimination in the school system (N. Y. Legis. Doc., 1945, No. 6, supra, p. 41), and the closely related comment that the school authorities ‘ ‘ do not need more law ” to suppress discrimination or to set up policies and programs against prejudice (p. 47).
The report covered more activities of the school authorities than preventing discrimination within the education system, and suggested the need for educational programs and policies to minimize prejudice in the whole community. It may be read as indicating an affirmative role to be played by the education administration in eliminating prejudice; as indicating also a conviction that the school authorities have sufficient legal authority to do this and do not need more law; but at the same time as proposing an active role for the new commission in this field with which the public education authorities would be expected to co-operate.
It may be doubtful if the court is allowed to consider in aid of legislative intention the affidavit of counsel for the Temporary Commission given many years after the report was filed and the statute passed and after the litigation had commenced, and read by one of contending parties (Woollcott v. Shubert, 217 N. Y. 212, 221-222; Matter of Delmar Box Co. [Ætna Ins. Co.], 309 N. Y. 60, 67).
That the Regents, the Department of Education and the petitioner, Board of Higher Education, all have the power, and the duty, under the Constitution and the statute, to eliminate discrimination in employment within their respective areas of jurisdiction is not to require the court to decide that in this *151 area alone the commission is without the power which it possesses in all other areas of public employment.
Every public agency having a roster of employees rests under the same duty as the school system to eliminate discrimination in employment. It is not disputed on this appeal that all are “ employers ” under the statute and that the commission has jurisdiction of them in matters involving discrimination in employment. The Attorney-General’s ruling in a relevant controversy has been in this direction (1946 Atty. Gen. 81).
The Commissioner of Mental Hygiene, to take one typical example from the list of departments of the State Government, has full administrative power to eliminate discrimination in employment in the Department of Mental Hygiene, which has a very large roster of employees (Mental Hygiene Law, §§ 3, 5), but the power of the commission to inquire into its employment practices and to invoke its enforcement procedures is undoubted.
The process of subsequent amendment of the statute does not advance the argument of the board. Before 1952 the commission had enforcement jurisdiction only in respect of employment. But in that year its jurisdiction was extended to include, in addition to discrimination in employment, discrimination in admission and use of facilities in places of public accommodation, resort or amusement (Executive Law, § 296, subd. 2; L. 1952, ohs. 284-285). This extension of jurisdiction as to a “ place of public accommodation, resort, or amusement” required a clarifying definition of what was meant by that clause (§ 292, subd. 9).
The Legislature defined it as not to include ‘ ‘ public libraries, kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses, and all educational institutions under the supervision of the regents of the state of New York ”.
But this is an exclusion of a group of institutions from a class affected by a new statutory rule of admissions to certain public places; and has no relevance, in our view, to the scope of power over employment vested in the commission by the original 1945 statute; nor were any of the provisions of that statute as they affected employment altered by the 1952 amendment.
*152 The jurisdictional controversy between the Board of Higher Education and the Commission for Human Bights arises over purported discrimination on religious grounds in employment practices affecting the teaching staff at Queens College, an institution within the board’s jurisdiction. The commission asserts in its pleading an intention to proceed under the enforcement provisions of the statute which sets up procedures which will afford due process, adequate inquiry, and judicial review of the commission’s proceedings (§§ 297, 298).
The court at Special Term prohibited the commission from taking any action either informally by way of inquiry, or under its enforcement process. The Appellate Division modified by affirming the order made at Special Term to the extent that it prohibited the commission from exercising its enforcement jurisdiction; but it reversed the order to the extent that it had prohibited the commission from making “ such investigations, studies, recommendations, programs, conciliation efforts, reports and proceedings as are provided for by and in conformity with subdivisions 8, 9 and 10 of Section 295 of the Executive Law ’ ’.
If it be held that the commission has power of enforcement of the statutory mandate, the power of inquiry into actual employment practices would seem to follow normally. The problem the majority in the Appellate Division had in' this part of the decision was to reconcile an absence of authority to enforce with the existence of an authority to inquire, but the scope of the power to inquire is not of large significance if the general power of the commission to enforce be accepted.
The amicus brief of the National Association for the Advancement of Colored People, arguing in support of the commission’s jurisdiction, suggests that the issue here is “of far more fundamental and transcendent importance than whether, in the particular instance which gives rise to these proceedings, discrimination in fact exists or can be demonstrated. * * * The far-reaching question here that is of great public importance is whether the State Commission for Human Bights has the power and authority to investigate a complaint of discrimination where an educational institution is involved. Admittedly the educational policies and programs of such institutions are not subject to the Commission’s control or supervision. But *153 merely because this must be so, it does not follow that the Commission is powerless to act in respect to the discriminatory practices of educational agencies and institutions.”
We agree that the issue before us significantly transcends the immediate controversy. We have in hand for construction a statute which requires a liberal reading “ for the accomplishment of the purposes thereof ” (§ 300). We witness beyond the statute, and, indeed, beyond the constitutional provision itself, a consistent purpose of the people of New York, growing in its firm insistence, to end discrimination based on race and creed.
It is not easy to escape the fact that discrimination in employment, with the consequent economic disparities upon which other kinds of discrimination thrive, is the main key to the problem. We ought not, therefore, construe the statute against discrimination restrictively to cut down in the field of public employment the authority of the only State agency which by law has been charged Avith the single duty of attacking discrimination in its economic center.
The order of the Appellate Division should be modified by dismissing the petition and, as thus modified, affirmed, Avithout costs.

. In addition to Queens College, the Board also administers City College, Hunter College, Brooklyn College, Division of Teacher Education, Bronx Community College, Queensboro Community College and Staten Island Community College. It employs about 6,500 employees in the following broad categories: instructional personnel about 5,000, administrative personnel about 700, custodial personnel about 800.