This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 35
Trathony Griffin and Michael Godwin,

Appellants,

v.

Sirva, Inc. and Allied Van Lines, Inc.,

Respondents.

Stuart L. Lichten, for appellants.
George W. Wright, for respondents.
Philip V. Tisne, for amicus State of New York.
Legal Action Center et al.; National Association of Professional Background Screeners; Consumer Data Industry Association; American Moving & Storage Association, Inc.; Erik M. Fink et al., amici curiae.

DiFIORE, Chief Judge:

The United States Court of Appeals for the Second Circuit has posed three questions regarding who may be liable under the New York State Human Rights Law. Two questions concern section 296 (15), which prohibits discrimination against

- 1 -

individuals with prior criminal convictions.  A third question concerns section 296 (6), which prohibits aiding and abetting discriminatory conduct.

Plaintiffs are two former employees of Astro Moving and Storage Co., Inc. (Astro), a New York company.  Astro hired plaintiffs as laborers in August 2008 and May 2010, respectively. Both have prior criminal convictions for sexual offenses against young children.

In June 2010, Astro entered into a contract with Allied Van Lines, Inc. (Allied), pursuant to which Astro performed moving services for Allied.  Allied, a nationwide moving company based in Illinois, is a subsidiary of Sirva, Inc. (Sirva). Thereafter, approximately 70 to 80 percent of Astro's work was performed for Allied.  The contract precluded Astro from working for other motor carriers, with limited exceptions.

The contract required Astro to adhere to Allied's Certified Labor Program guidelines, which required that employees who "conduct the business of Allied at customer's home or place of business . . . must have successfully passed a criminal background screen . . . as specifically approved by Allied."  If Astro violated the guidelines by using unscreened labor, it was subject to escalating monetary penalties.  Under these guidelines, employees automatically failed the criminal background screen if they had ever been convicted of a sexual offense.

In 2011, plaintiffs consented to have Sirva and/or its agents investigate their criminal records, which identified their convictions for sexual offenses against young children.  Soon thereafter, Astro fired plaintiffs.[1]

Plaintiffs and a third Astro employee who is not a party to the Second Circuit appeal sued Astro, Sirva, and Allied in the United States District Court for the Eastern District of New York.  The complaint alleges violations of the New York State Human Rights Law §§ 296 (15) and (6), the New York Labor Law, the Fair Labor Standards Act, and 42 USC § 1981.  Only the claims under the Human Rights Law are relevant here.

Plaintiffs moved for partial summary judgment against all defendants on liability for their section 296 (15) claim, which alleged discrimination on the basis of their prior criminal convictions.  Defendants Allied and Sirva cross-moved for summary judgment.  The district court denied plaintiffs' motion and granted Allied and Sirva's motion.  The district court held that section 296 (15) applies only to employers; that neither Sirva nor Allied was plaintiffs' employer; and that neither Sirva nor Allied was liable under section 296 (6), which imposes aiding and abetting liability, because neither participated in firing plaintiffs.

---

[1] The Second Circuit acknowledges there is some dispute regarding whether one plaintiff was actually "terminated" or whether he voluntarily resigned.  Like the Second Circuit, we assume, without deciding, that Astro fired both plaintiffs.

Plaintiffs appealed to the Second Circuit.[2]
Recognizing that the appeal presented unresolved questions under
New York law, the Second Circuit certified three questions to
this Court regarding who is liable under the New York State Human
Rights Law (Griffin v Sirva Inc., 835 F3d 283 [2d Cir 2016]).

## Certified Question No. 1

The first certified question asks:  "Does Section 296
(15) of the New York State Human Rights Law, prohibiting
discrimination in employment on the basis of a criminal
conviction, limit liability to an aggrieved party's 'employer'?"
(835 F3d at 294).  We answer this question in the affirmative.

Human Rights Law § 296 (15) provides that:

> "[i]t shall be an unlawful discriminatory
> practice for any person, agency, bureau,
> corporation or association, including the
> state and any political subdivision thereof,
> to deny any license or employment to any
> individual by reason of his or her having
> been convicted of one or more criminal
> offenses . . . when such denial is in
> violation of the provisions of article
> twenty-three-A of the correction law.
> Further, there shall be a rebuttable
> presumption in favor of excluding from
> evidence the prior incarceration or
> conviction of any person, in a case alleging

---

[2] While plaintiffs' appeal was pending, their claims against
Astro proceeded to a jury trial.  The jury found that Astro was
not liable on plaintiffs' claims under the Human Rights Law.
Although Allied and Sirva argued to the Second Circuit that the
jury verdict in favor of Astro should defeat plaintiffs' claims
against them, the Second Circuit declined, as a matter of federal
procedure, to consider the impact of the verdict on the appeal
because the verdict was not before the district court on the
summary judgment motion.

> [negligent hiring claims] if after learning
> about an applicant or employee's past
> criminal conviction history, such employer
> has evaluated the factors set forth in
> [Correction Law § 752], and made a
> reasonable, good faith determination that
> such factors militate in favor of hire or
> retention of that applicant or employee."

Plaintiffs argue that, by its plain language, the law extends liability beyond employers to "any person," in contrast to other Human Rights Law prohibitions, which expressly limit liability to employers or related entities such as licensing or employment agencies. For instance, section 296 (1) (a) refers expressly to "an employer or licensing agency"; similarly, section 296 (1) (b) makes it unlawful "[f]or an employment agency to discriminate" in employment on the basis of age, race, creed, color, or other specified grounds (Executive Law § 296 [1] [a]; [1] [b] [emphasis added]). In addition, plaintiffs contend that the absence of the word "employer" from the first sentence in subdivision (15) is made all the more glaring by the use of the word twice in the second sentence addressing liability for negligent hiring practices. Allied and Sirva respond that the plain meaning of section 296 (15) as a whole, which incorporates Article 23-A of the Correction Law (Article 23-A) by reference, limits liability to employers.

We agree that liability under section 296 (15) arises only upon a violation of Article 23-A. Section 296 (15) prohibits "deny[ing] any license or employment . . . when such denial is in violation of the provisions of article [23-A]."

Article 23-A, in turn, instructs that "[n]o application for any license or employment, and no employment or license held by an individual, to which the provisions of this article are applicable, shall be denied or acted upon adversely by reason of the individual's having been previously convicted of one or more criminal offenses" (Correction Law § 752).

In contrast to the Human Rights Law, Article 23-A specifies further that the prohibition applies "to any application by any person for a license or employment <u>at any public or private employer</u> . . . and to any license or <u>employment held</u>" (Correction Law § 751 [emphasis added]).  This language targets the employer, public or private, where the individual is employed or has applied for employment.  In particular, with respect to prospective employment, liability arises only when it concerns an application "at" an employer; with respect to existing employment, liability arises only when an employer discriminates against an existing employee.  In other words, the application or employment must relate to a specific or otherwise identified employer.

Two exceptions to Article 23-A's prohibitions, set out in Correction Law § 752, further clarify the scope of the statute.  The first exception applies when "there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual" (Correction Law § 752 [1]).  The second exception

applies when "the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public" (Correction Law § 752 [2]). To determine whether either exception applies, "the public agency or private employer" shall consider eight enumerated factors (Correction Law § 753 [1] [emphasis added]). These provisions make clear that Article 23-A is addressed to employment determinations made by public and private employers, and further demonstrate that only employers can violate Article 23-A, and hence, section 296 (15).

Reading Correction Law §§ 751, 752, and 753 together, Article 23-A limits liability for employment discrimination to an employer -- either public or private. Section 751 targets discrimination against an applicant "at" a particular employer or against an existing employee. Section 752 sets out what conduct it prohibits, and provides two exceptions. Under either exception, "the public agency or private employer" must consider the eight listed factors (Correction Law § 753). In other words, a cause of action arises only if a person is denied employment by a particular employer because of a prior criminal conviction and the employer did not follow the procedure to determine whether an exception applies. Because it incorporates Article 23-A by reference, section 296 (15) of the Human Rights Law likewise limits liability to a public or private employer. No room exists under either the Correction Law or section 296 (15) to hold a

nonemployer liable for employment discrimination.

Rather than follow section 296 (15)'s instruction to look to Article 23-A of the Correction law, the dissent ignores the significance of §§ 751 through 753 thereof and instead reads section 296 (15) in isolation. The dissent contrasts the use of the word "employer" in the second sentence of section 296 (15) with its absence in the first sentence of the section and concludes that the scope of liability set out in the first sentence must therefore extend beyond employers (dissenting op at 4). In our view, this apparent discrepancy is not a discrepancy at all. The first sentence is stated more broadly because the prohibition on discrimination (as elucidated further in Article 23-A) applies to both private employers and public agencies. The second sentence, in contrast, solely concerns negligent hiring claims. These claims may be brought against private employers only, not public agencies. Thus the use of the word "employer" in the second sentence not only makes sense, but is required.[3]

The legislative history of section 296 (15) leads to the same conclusion that the broad language of the statute was intended to apply to private employers and public agencies. The Bill Jacket's Approval Memorandum states that the legislation "provides reasonable standards to be applied by public agencies

---

[3] Negligent hiring claims are generally barred against public agencies under the doctrine of governmental function immunity (see e.g. Mon v City of New York, 78 NY2d 309, 313-16 [1991]).

and private employers when considering applications by former offenders" (Governor's Approval Mem, Bill Jacket, L 1976, ch 931 at 6).  The chairman of the Senate Committee on Crime and Correction, which sponsored the bill, submitted a memorandum stating that this amendment is "applicable . . . to any employer whether private or public" (Mem of Committee on Crime and Correction, Bill Jacket, L 1976, ch 931 at 8).  Contrary to what the dissent implies, the legislative history does not indicate any person or entity other than an employer who may be liable under section 296 (15).

Accordingly, we answer the first certified question in the affirmative.

### Certified Question No. 2

Because we answered the first certified question in the affirmative, we turn to the second question, which asks:  "If Section 296 (15) is limited to an aggrieved party's 'employer,' what is the scope of the term 'employer' for these purposes, *i.e.* does it include an employer who is not the aggrieved party's 'direct employer,' but who, through an agency relationship or other means, exercises a significant level of control over the discrimination policies and practices of the aggrieved party's 'direct employer'?" (835 F3d at 294).

The question presumes that "a significant level of control" over "discrimination policies," standing alone, might confer employer status on an entity that is not the aggrieved

party's direct employer.  However, other factors are relevant to that determination.  We therefore reformulate this question to reflect what the Second Circuit described in its ruling as an open question of New York law for this Court:  "[i]f Section 296 (15) is limited [to an employer,] how should courts determine whether an entity is the aggrieved party's 'employer' for the purposes of a claim under Section 296 (15)?" (835 F3d at 285).

Plaintiffs contend that the term "employer" should be construed at least as broadly as it is in the context of Title VII of the Civil Rights Act of 1964, the federal analogue to the Human Rights Law.  They cite the Second Circuit's decision in Spirt v Teachers Ins. & Annuity Ass'n, which held that the term employer is "sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' . . . as that term has generally been defined at common law" (691 F2d 1054, 1063 [2d Cir 1982] [internal quotation marks and citation omitted]).  They contend that Spirt and its progeny apply this "effective control" test to determine who is an employer.  Allied and Sirva counter that the Second Circuit later abandoned Spirt, holding instead that in Title VII cases the common-law definition of "employer" should apply.

The Human Rights Law and Article 23-A of the Correction Law contain definitions of "employer" and "private employer,"

respectively, which relate solely to the number of persons employed (Executive Law § 292 [5]; Correction Law § 750 [2]). Neither definition provides guidance on who may be deemed an employer.  Our prior decisions have acknowledged the absence of a substantive definition of "employer" in the Human Rights Law.  In Matter of Board of Higher Educ. of the City of N.Y. v Carter (14 NY2d 138 [1964]), this Court adopted the dictionary definition of "employer," stating that it had found no other definition as "clear and comprehensive" (id. at 147, quoting Report of NY State Temp Comm Against Discrimination, 1945 NY Legis Doc No. 6 at 28; see also Patrowich v Chemical Bank, 63 NY2d 541, 543 ["The Human Rights Law definition of employer . . . provides no clue to whether individual employees of a corporate employer may be sued under its provisions"]).

Federal courts likewise have wrestled with a similar ambiguity in the term "employer" in the context of Title VII and other federal statutes. In 1992, the United States Supreme Court held that absent a statutory definition of "employer," courts should apply the common law to determine who is an employer (Nationwide Mut. Ins. Co. v Darden, 503 US 318, 322-323 [1992]). This doctrine, as articulated in an earlier Supreme Court decision, identifies 13 factors, the most relevant being the alleged employer's control over the individual (id. at 323-324, citing Community for Creative Non-Violence v Reid, 490 US 730, 751-52 [1989]).

Following <u>Darden</u>, the Second Circuit held that because Title VII contains a "'nominal' or . . . otherwise unhelpful" definition of "employer," the common-law test should govern (<u>Gulino v New York State Educ. Dept.</u>, 460 F3d 361, 371-372 [2006]).  As in <u>Darden</u>, "the common-law element of control is the principal guidepost that should be followed" (<u>id.</u> at 371 [internal quoation marks and citation omitted]).

In a different context, we have held that "[t]he standards for establishing unlawful discrimination under section 296 of the Human Rights Law are the same as those governing title VII cases under the Federal Civil Rights Act of 1964" (<u>Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights</u>, 100 NY2d 326, 330 [2003]; <u>see</u> <u>also</u> <u>Margerum v City of Buffalo</u>, 24 NY3d 721, 731 [2015] ["We have consistently held that the standards for recovery under the New York Human Rights Law are in nearly all instances identical to title VII and other federal law."]).  In this instance, the lack of clarity in the Human Rights Law itself certainly permits us to look to Title VII cases for guidance.

That said, we need look no further than our own lower courts to determine who is an employer under the Human Rights Law.  Decades before <u>Gulino</u>, our lower courts applied New York common law to make that determination.  In <u>State Div. of Human Rights v GTE Corp.</u>, the Appellate Division identified four relevant factors:  "'(1) the selection and engagement of the

servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct'" (109 AD2d 1082, 1083 [4th Dept 1985], quoting 36 NY Jur, Master and Servant, § 2). As with the Reid test (endorsed in Darden and Gulino), "'[t]he really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter'" (id.).

In light of the foregoing, we answer the second certified question, as reformulated, as follows: common-law principles, as discussed in GTE, determine who may be liable as an employer under section 296 (15) of the Human Rights Law, with greatest emphasis placed on the alleged employer's power "to order and control" the employee in his or her performance of work.

## Certified Question No. 3

The third certified question asks: "Does Section 296 (6) of the New York State Human Rights Law, providing for aiding and abetting liability, apply to § 296 (15) such that an out-of-state principal corporation that requires its New York State agent to discriminate in employment on the basis of a criminal conviction may be held liable for the employer's violation of § 296 (15)?" (835 F3d at 294).

In our view, this question does not concern whether there was discrimination in this particular case, but rather

seeks clarification as to who may be liable under section 296 (6)
-- similar to the two prior questions regarding section 296 (15).
Therefore, we reformulate the question to ask "whether section
296 (6) extends liability to an out-of-state nonemployer who aids
or abets employment discrimination against individuals with a
prior criminal conviction."  To this reformulated question, we
answer in the affirmative.

Section 296 (6) states:  "It shall be an unlawful
discriminatory practice for any person to aid, abet, incite,
compel or coerce the doing of any of the acts forbidden under
this article, or to attempt to do so."  The district court held
that for section 296 (6) to apply to a third-party entity who is
not the plaintiff's direct employer, the third party and the
employer must be "joint employers" (Griffin v Sirva, Inc., US
Dist Ct, ED NY, 11 Civ 1844, Brodie, J., 2014).  The Second
Circuit questioned whether this was correct (Griffin, 835 F3d at
293).

Section 296 (6) extends liability to persons and
entities beyond joint employers, and this provision should be
construed broadly.  Section 296 (6) applies to any "person."
Unlike section 296 (15), nothing in the statutory language or
legislative history limits the reach of this provision to
employers.  Indeed, the purpose of subdivision (6) was "to bring
within the orbit of the bill all persons, no matter what their
status, who aid or abet any of the forbidden practices of

discrimination or who attempt to do so," as well as "to furnish protection to all persons, whether employers, labor organizations or employment agencies, who find themselves subjected from any source to compulsion or coercion to adopt any forbidden employment practices" (Report of NY State Temp Comm Against Discrimination, 1945 NY Legis Doc No. 6 at 31).

In accord with that purpose, we have previously applied section 296 (6) to a newspaper company that had no employment relationship with the plaintiff (National Org. for Women v State Div. of Human Rights, 34 NY2d 416 [1974]).  In National Org. for Women (NOW), the defendant newspaper company divided employment listings into categories with the captions "Help Wanted--Male" and "Help Wanted--Female" (id. at 419).  We held that these listings discriminated on the basis of sex.  Although the defendant did not "directly perpetuat[e]" the discrimination since it was not the women's employer or prospective employer, it "aided and abetted" such discrimination as condemned by section 296 (6) (id. at 421).  Notably, the Court in NOW did not consider the issue of whether, separate from the newspaper company, any employer or prospective employer was liable for primary discrimination under the Human Rights Law.

Section 296 (6) also applies to out-of-state defendants.  The Human Rights Law contains an extraterritoriality provision, which provides:  "The provisions of this article shall apply as hereinafter provided to an act committed outside this

state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice if committed within this state" (Executive Law § 298-a [1]).  We have held that "[t]he obvious intent of the State Human Rights Law is to protect 'inhabitants' and persons 'within' the state, meaning that those who work in New York fall within the class of persons who may bring discrimination claims in New York" (Hoffman v Parade Publs., 15 NY3d 285, 291 [2010]).  In particular, the extraterritoriality provision "protects New York residents . . . from discriminatory acts committed outside the state" (id. at 292).  To prevail, the injured party "must plead and prove that the alleged discriminatory conduct had an impact in New York" (id.).

Accordingly, the first certified question should be answered in the affirmative and the remaining questions, as reformulated, answered in accordance with this opinion.

Griffin v Sirva

No. 35

RIVERA, J.(dissenting):

The Second Circuit has certified to us three questions regarding the proper interpretation of sections 296 (15) and 296 (6) of the New York State's Human Rights Law (HRL), arising in an action by plaintiffs who allege they were terminated from employment based on their prior criminal convictions (Griffin v Sirva Inc., 835 F3d 283 [2d Cir 2016]). The majority's approach disregards the express statutory terms of the HRL and the legislative mandate that it be construed liberally to achieve its remedial antidiscrimination purposes. I therefore write separately to explain how the relevant sections should be analyzed in accordance with the text and legislative intent.

I.

The first certified question from the Second Circuit asks, "Does Section 296 (15) of the New York State Human Rights Law, prohibiting discrimination in employment on the basis of a criminal conviction, limit liability to an aggrieved party's 'employer'?" The answer, based on the language of section 296 (15), as confirmed by its legislative purpose, is no.

The HRL embodies New York's strong public policy

- 1 -

against discrimination (New York Inst. of Tech. v State Div. of Human Rights, 40 NY2d 316, 324 [1976]). As stated expressly in the Executive Law, the HRL "shall be construed liberally" to achieve its purposes (Executive Law § 300). To that end, "it is the duty of courts to make sure that the Human Rights Law works and that the intent of the Legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics" (City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 428 [1975]).

As one of several amendments issued over the years that expand the reach of the HRL, the legislature enacted section 296 (15), along with simultaneous amendments to the Corrections Law, to serve as a general bar on unlawful employment discrimination against individuals with prior criminal convictions (Correction Law art 23-A; Acosta v New York City Dep't of Educ., 16 NY3d 309, 314 [2011]).[1] The new provisions were intended to "facilitate the obtainment of employment for ex-offenders and to aid their rehabilitation by eliminating many of the obstacles to employment" (Mem in Support, Bill Jacket, L 1976, ch 931). Beyond the obvious protection these provisions afford to individuals, the legislature recognized that improving the employment opportunities of the formerly convicted would benefit society. The sponsors' supporting memorandum declared

---

[1] The prohibition in section 296 (15) on discrimination in licensing is not at issue here.

that "[u]nemployment is the greatest deterrence to rehabilitation as statistics indicate that many of the ex-offenders return to lives of crime because other employment is not available" (Mem in Support, Bill Jacket, L 1976, ch 931). The Governor's memorandum similarly noted that "[o]bservers of our criminal justice system agree that the key to reducing crime is a reduction in recidivism. . . . The great expense and time involved in successfully prosecuting and incarcerating the criminal offender is largely wasted if upon the individual's return to society, [the individual's] willingness to assume a law-abiding and productive role is frustrated by senseless discrimination" (Gov Approval Mem, Bill Jacket, L 1976, ch 931).  Thus, "[p]roviding a former offender a fair opportunity for a job is a matter of basic human fairness, as well as one of the surest ways to reduce crime" (id.).

In furtherance of these dual goals, section 296 (15) sweeps broadly and declares:

> "It shall be an unlawful discriminatory
> practice for any person, agency, bureau,
> corporation or association, including the
> state and any political subdivision thereof,
> to deny any license or employment to any
> individual by reason of his or her having
> been convicted of one or more criminal
> offenses, or by reason of a finding of a lack
> of 'good moral character' which is based upon
> his or her having been convicted of one or
> more criminal offenses, when such denial is
> in violation of the provisions of article
> twenty-three-A of the correction law.
> Further, there shall be a rebuttable
> presumption in favor of excluding from
> evidence the prior incarceration or

conviction of any person, in a case alleging that the employer has been negligent in hiring or retaining an applicant or employee, or supervising a hiring manager, if after learning about an applicant or employee's past criminal conviction history, such employer has evaluated the factors set forth in section seven hundred fifty-two of the correction law, and made a reasonable, good faith determination that such factors militate in favor of hire or retention of that applicant or employee."

By the text's clear language, section 296 (15) is not limited to "employers," but applies to any person or entity listed therein, so long as that actor's conduct violates Article 23-A of the Correction Law. Thus, the first sentence of section 296 (15) identifies those subject to its prescriptions by the named category of actor, not by the actor's relationship to the victim of the discriminatory conduct. Plainly, this evinces the legislature's intent to cover unlawful conduct by employers and non-employers alike.

References to an "employer" found later in section 296 (15) confirm that this is the legislature's intended construction. In the second sentence, "employer" is mentioned only with respect to an evidentiary rebuttable presumption established in section 296 (15) and applicable in cases asserting claims against an employer for the employer's negligent employment actions. This part of section 296 (15) is directed at the only actor implicated by the rebuttable presumption, the employer. By contrast, the part that prohibits discriminatory practices -- set forth in the first sentence -- applies to "any

person, agency, bureau, corporation or association," making clear that these terms are not limited to an employer.

"It is an elementary rule of interpretation that all parts of an act are to be read and construed together to determine the legislative intent, and that all should be harmonized with one another" (Levine v Bornstein, 4 NY2d 241, 244 [1958]; see also Stat Law § 97).  "[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea" (Antonin Scalia & Bryan A. Garner, Reading Law 170 [2012]).  As the Second Circuit noted here, the fact that the term "employer" is "used twice in the second half of the provision makes its absence in the first half addressing discrimination even more glaring" (Griffin, 835 F3d at 290).[2]

---

[2] The majority's explanation for why the legislature used the term "employer" only in the second but not the first sentence of section 296 (15) is an unnatural reading of this section and ignores every relevant rule of statutory construction (see e.g. McKinney's Cons Laws of NY, Book 1, Statutes, § 76 [Ordinary-Meaning Canon]; McKinney's Cons Laws of NY, Book 1, Statutes, § 114 [General-Terms Canon]; see also United States v Castleman, 134 S Ct 1405, 1417 [2014] [Scalia, J. concurring] [Presumption of Consistent Usage]). If, as the majority posits, the first sentence is intended to encompass "public and private employers," why exclude these three words from the exhaustive list of those chargeable under section 296 (15) with a discriminatory practice? Surely it is not for lack of familiarity with these words and their intended application since the legislature used the phrase "public and private employers" in Article 23-A (Correction Law § 751).  The most legally sound interpretation of section 296 (15) is that the legislature intended that each word be given meaning. Certainly the legislature could not have anticipated its selective list of entities would support a tortured construction of this section that is neither liberal, as mandated by Executive

The legislature's use of the term "employer" and "person" in other parts of the HRL, and its choice to refer to one over the other, confirms the word choice in section 296 (15) is by design.  To take two examples, section 296 (1) (a) states it is a violation for "an employer or licensing agency" to "refuse to hire or employ or bar or to discharge from employment" on the basis of "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, or marital status." Section 296 (3) (a) states it is unlawful for any "employer, licensing agency, employment agency or labor organization" to refuse to provide reasonable accommodations to known disabilities or pregnancy related conditions of "an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program."  In section 296 (15), the legislature expressly set forth a list of actors subject to its prescriptions.  Nowhere in this list is "employer" mentioned.  We must give meaning to every word when interpreting the statute, and harmonize its terms, but we cannot add words or interpret a statute in contradiction with the legislature's express manifestations of its intent (see DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]).

---

Law § 300, nor in furtherance of its general antidiscrimination purpose or its specific goal of increasing job opportunities by removing barriers to employment of persons with criminal records.

Despite the commands of these rules of construction, and the words in the statutory text, the majority narrowly interprets section 296 (15) to apply only to employers based on what the majority calls that section's incorporation of Article 23-A (majority op at 5). This reflects a misunderstanding of the scope and purpose of section 296 (15) and the import of that section's cross reference to Article 23-A. That cross reference is meant to identify an HRL discriminatory practice by conduct and result, and is not intended as establishing the relationship of the offending actor to the aggrieved party.

A close reading of these two sections illustrates the proper inter-statutory construction. Section 296 (15) provides that it is an unlawful discriminatory practice for any person or listed entity "to deny . . . employment to any individual by reason of his or her having been convicted of one or more criminal offenses, or by reason of a finding of a lack of 'good moral character' which is based upon his or her having been convicted of one or more criminal offenses, when such denial is in violation of the provisions of article twenty-three-A of the correction law." This part tracks the language of Corrections Law § 752, which provides that no employment shall be denied or acted upon adversely based on an individual's prior criminal conviction, unless either of two exemptions set forth therein apply. These exemptions require the application of reasonable assessment standards to a person with a prior criminal conviction

(see Approval Mem, Bill Jacket, L 1976, ch 931).  Keeping in mind

the primary purpose of both the HRL and Article 23-A is to

eliminate employment barriers to those with criminal convictions

in order to increase work opportunities and reduce recidivism,

the logical interpretation of the statutory cross-reference is

that the proscription targets all offending conduct, as a result

of actions of employers and non-employers.[3]

        The majority's reliance on legislative history to

support its alternative construction is misplaced.  This Court

has consistently held that legislative history should only be

consulted where "the plain intent and purpose of a statute would

otherwise be defeated" based on the "literal language of a

statute" (Bright Homes, Inc. v Wright, 8 NY2d 157 [1960]), and

here the literal language of the statutes are aligned with their

legislative purpose of expanding opportunities and removing

barriers to employment.  Further, and contrary to the majority's

_____

     [3] The majority places great weight on the use of the
preposition "at" in the first sentence of Corrections Law § 751,
which states, "[t]he provisions of this article shall apply to
*any* application by *any* person for a license or employment at *any*
public or private employer. . . ." (emphasis added).
Interpreting this clause liberally, as the statute mandates
(Executive Law § 300), leads to the conclusion that the
provisions in Article 23 apply to any person's application for
any kind of employment at any employer.  To read this clause to
constrain the HRL so that "the application . . . must relate to a
specific or otherwise identified employer" runs counter to the
HRL's direct interpretive guidance (Executive Law § 300; see also
Post v 120 E. End Ave. Corp., 62 NY2d 19, 24 [1984] [Statute
remedial in nature "should be liberally construed to spread its
beneficial effects as widely as possible.").

suggestion, mere mention in the legislative history of reasonable standards applicable to employers does not mean that the legislature intended to exclude actions by nonemployers from coverage.  Otherwise Article 23-A would not be couched in language specific to the outcome -- i.e. denial of employment or adverse employment action -- but would state simply that an employer cannot discriminate in employment based on a criminal conviction unless one of the two exceptions applies.  Tellingly, section 753 places the responsibility of considering the exemptions squarely on the shoulders of an employer, as that is the entity in the position to determine whether the exemptions apply to the particular circumstances of the individual and the job (see Correction Law § 753 [1]).

Even if the majority were correct that Article 23-A targets employers, the HRL is not so limited.  The HRL seeks to ferret out discriminatory practices across a wide range of areas -- public and private employment and housing; education; credit; public accommodations, resort and amusement; public services -- and casts a wide net over those whose actions deny "every individual in the state . . . an equal opportunity to enjoy a full and productive life" (Executive Law § 290; see Koerner v State, 62 NY2d 442, 449, 467  [1984] [HRL has "broad, ameliorative purposes."]).  To further the legislature's antidiscrimination purpose in the area of employment, our interpretation of the HRL must be grounded in the realities of

the modern workplace, especially the variegated shifts in employment relationships.

The changing nature of the employer-employee construct has a particularly adverse impact on job opportunities for persons with prior criminal convictions.  Non-traditional employment structures are now commonplace, such that several persons or business entities are positioned to significantly affect the employment relationship (see Keith Cunningham-Parmeter, From Amazon to Uber. Defining Employment in the Modem Economy, 96 BU L Rev 1673, 1683, 1727 [2016]; Noah Zatz, Working Beyond the Reach or Grasp of Employment Law, The Gloves-Off Economy: Workplace Standards at the Bottom of America's Labor Market, 31, 37-42 [Annette Bernhardt et al. eds. 2008]).  For several reasons, large numbers of individuals with criminal histories have limited employment options and find themselves on the fringes of the labor market, and more reliant than other job applicants on temporary staffing companies (see Gretchen Purser, "Still Doin' Time": Clamoring for Work in the Day Labor Industry, 15 J Lab Soc'y 397, 408 [2012]).  Moreover, unlike when the legislature first adopted section 296 (1) and Article 23-A, it is easier and less expensive to do a background check and subsequently disqualify large numbers of persons based on the single question of whether the individual has ever been convicted of a crime, without any consideration of the individual's circumstances and the nature of the job.  The

majority's reading ignores that this is the exact scenario section 296 (15) -- and Article 23-A -- seek to address (see Acosta, 16 NY3d at 314; Gov Approval Mem, Bill Jacket, L 1976, ch 931). Simply stated, the point of these statutes is to increase the likelihood that persons with criminal records will find work and live productive lives rather than return to a life of crime. Structural obstacles to that goal are the precise target of the legislative scheme.

The majority's interpretation of section 296 (15) also relies on a flawed "incorporation" analysis that, by its terms, limits the class of employers subject to section 296 (15). Article 23-A defines "private employer" as "any person, company, corporation, labor organization or association which employs ten or more persons" (Correction Law § 750). By contrast, the HRL states that "employer" "does not include any employer with fewer than four persons in his or her employ" (Executive Law § 292 [5]). "Person," meanwhile, is defined by Human Rights Law § 292 (1) to include "one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." There is an inconsistency between the two statutes, as section 296 (15) would apply to an employer that employs six persons, while Article 23-A would not. Stated another way, the class of employers covered by Article 23-A is smaller than the class of employers covered by HRL. If, as the majority reasons, only actions by employers who violate

Article 23-A are subject to section 296 (15), then fewer employers would be covered by its prescriptions, in direct contravention of the HRL.  This interpretation oversteps the bounds of our judicial role as the body tasked with interpreting, not rewriting, the laws (Morgenthau v. Citisource, Inc., 68 NY2d 211, 223 [1986]).  Certainly this is not what the legislature intended when it made the policy choice to cover entities with a minimum of four employees.

The majority also fails to adequately explain why reference to "person" in section 296 (15) is limited to an employer, but the same term in section 296 (6) applies to any individual or entity, even absent an employment relationship with the aggrieved party (majority op at 14-15).  It is counter to both the HRL's antidiscrimination goal and common sense to read the plain language of section 296 (15) narrowly, only to then adopt a definition of "person" that encompasses certain non-employers but not others.

For the reasons I have discussed, the prescriptions of section 296 (15) are not limited to an employer.  Therefore, the first certified question should be answered in the negative, rendering it unnecessary to answer the second certified question.


                              II.

The majority has chosen to respond to the second certified question, as reformulated by my colleagues, to ask how

a court determines whether an entity is an employer within the meaning of section 296 (15).  While I do not believe the Court should reach this question, I write to explain my disagreement with the majority's answer.

The majority states that a court must consider common-law principles, with an emphasis on the employer's power to "order and control" the employee's work performance (majority op at 12-13).[4]  In some instances, this approach would broaden the definition of employer beyond the traditional direct employer (i.e., the entity that hires and compensates the aggrieved employee) to include a non-direct or indirect employer (e.g., corporate parents and franchisors).  This theory of employer certainly brings the majority closer to the intent of the HRL in some cases, but the approach is still too narrow.  Here, applying the four factors laid out in State Div. of Human Rights v GTE Corp. (109 AD2d 1082, 1083 [4th Dept 1985], quoting 36 NY Jur, Master and Servant, § 2), with "greatest emphasis placed on the alleged employer's power 'to order and control'" the employee's work performance (majority op at 11-12), it is unlikely that

---

[4] The majority relies on title VII in answering the second certified question to expand the category of parties who can be held liable for violations under section 296 (15), but title VII does not prohibit discriminatory practices against persons with criminal records as prescribed by the HRL. Indeed, "[a]s a precursor to the 1964 Civil Rights Act, the Human Rights Law is not modeled on title VII, and has certain significant distinctions that extend its coverage beyond that of title VII" Margerum v City of Buffalo, 24 NY3d 721, 736 [2015] [Rivera, J. dissenting]). In this case, title VII lends no guidance on the intent and purpose of the HRL.

either defendant could be found to be an employer.  Neither contributed to the selection and engagement of Astro employees, paid salary or wages, possessed the power of dismissal, or controlled Astro's employees' conduct (see majority op at 12-13). It is even more difficult to see how Allied or Sirva would meet the test in Community for Creative Non-Violence v Reid (490 US 730, 751-752 [1989])(majority op at 13).

        The majority's position could also be read to exclude certain non-employers who are able to adversely affect employment of a person with a criminal record or even to bar access to employment all together.  As the State points out, "background-check or credit-reporting agencies (which screen job applications on behalf of employers) have automatically disqualified job candidates with criminal histories and sent them rejection letters -- thus, preventing such candidates from even getting their foot in the door of the hiring process" (Brief of State of New York as Amicus Curiae 17).  An employment agency does not have control over the worker's employment terms, conduct, retention or dismissal, and does not pay the worker's wages (see GTE Corp., 109 AD2d at 1083).  Rather, these agencies serve as the gatekeeper between the applicant and the employer.  In that gatekeeping role, they have an enormous impact on employment opportunities (see Sibley Mem'l Hosp. v Wilson, 488 F2d 1338, 1341 [DC Cir 1973] [party who was an intermediary between employees and employers denied potential employees significant

employment opportunities when exercising control of access to potential employers]). Exclusion of such actors from the proscriptions of section 296 (15) runs counter to its legislative purpose and ignores that over the years the legislature has continued to broaden coverage under the HRL to address the greatest expanse of discriminatory practices (L 1975, ch 803; L 1996, ch 204; L 2002, ch 2; L 2003, ch 106; L 2005, ch 75; L 2009, ch 80; L 2010, ch 196; see Margerum v City of Buffalo, 24 NY3d 721, 734 [2015] [Rivera, J. dissenting, discussing history of expansion]).

Of course if such actors were encompassed within the definition of employer adopted by the majority, the majority would have effectively come around to my view of section 296 (15), i.e. that this section covers employers and non-employers who are involved in the denial of employment, or adversely act upon an application or employment based solely on the fact of an individual's prior criminal conviction. In any case, there are unforeseen consequences of adopting a definition of "employer" that may have broader application beyond these certified questions. We should be especially cautious about pronouncing a legal theory when it is unnecessary to do so and without input from the State, which here declined to propose an answer to the second certified question regarding the definition of the term "employer."

                              III.

     The Second Circuit's third certified question asks:
"Does Section 296(6) of the New York State Human Rights Law,
providing for aiding and abetting liability, apply to § 296 (15)
such that an out-of-state principal corporation that requires its
New York State agent to discriminate in employment on the basis
of a criminal conviction may be held liable for the employer's
violation of § 296 (15)?"  That question must be understood,
following the first and second certified questions, as an attempt
to determine liability under section 296 (6) if this Court
concludes that such an out-of-state actor would not be subject to
section 296 (15).  I would not answer the third question because
the entity and conduct described would be covered under section
296 (15), as such an entity fits within the broad coverage of the
statute as I have described it.

     However, the majority has chosen to reformulate the
question to address whether an out-of-state non-employer who aids
or abets employment discrimination may be liable under section
296 (6) (majority op at 14).  That reformulated question is no
question at all because section 296 (6) applies to "any person"
that aids or abets a discriminatory practice, and thus includes
an actor who mandates discrimination, and, as the majority
correctly states, the HRL, by its terms and in accordance with
our case law, has extraterritorial reach (Executive Law § 298-a
[1]); Hoffman v Parade Publs., 15 NY3d 285, 291 [2010]; majority

op at 15-16).

        To the extent the majority suggests in its discussion

of National Org. for Women v State Div. of Human Rights (34 NY2d

416 [1974] (NOW) that section 296 (6) may be read so broadly as

to cover any actor with a tangential connection to discrimination

writ large, I disagree.  It is true that in NOW, this Court

stated that the newspaper company did not "directly perpetuat[e]

discrimination" based solely on its own actions (NOW, 34 NY2d at

421).  However, the newspaper's use of separate job listings

based on sex aided and abetted sex discrimination within the

meaning of the HRL because the listings ensured the

discriminatory outcome prohibited by law.  As the Court

explained,

> "it is often the case that a person or
> organization acting in a manner which
> genuinely intends to be descriptive becomes
> in effect prescriptive.  A policy purporting
> to reflect a statistical phenomenon actually
> becomes a self-fulfilling prophecy which
> helps to generate the very presumptive
> foundation for its existence. . . .  Such sex
> discrimination, of course, is prohibited by
> section 296 of the Executive Law and those
> who aid or abet such unlawful discrimination
> are also chargeable with an unlawful
> discriminatory practice" (id. at 421).

Further, the employers who knowingly listed the jobs were, at a

minimum, complicit in perpetuating "unlawful discrimination

against women" (id. at 420), as without the employers' submission

of job announcements there would be no separate listings.

Therefore, the case suggests that section 296 (6), liberally

construed, requires engagement with or an attempt to influence a direct or nondirect actor to violate the HRL.[5]

The statutory language bears this out.  Here, Astro is not an aider and abetter because it was plaintiffs' direct employer, and cannot aid and abet its own direct discriminatory practice (Medical Exp. Ambulance Corp. v Kirkland, 79 AD3d 886, 888 [2d Dept 2010]; Hardwick v Auriemma, 116 AD3d 465, 468 [1st Dept 2014] [An individual cannot aid and abet his own violation of the HRL]).  If Allied was not an employer within the meaning of section 296 (15), it would not have aided and abetted Astro's termination of the plaintiffs because Allied's rule required nonassignment to its jobs, not plaintiffs' termination.  Although it is possible that due to the significant economic value of Allied's contract with Astro, Allied's rule prohibiting plaintiffs from working on their moving jobs arguably compelled and coerced Astro's discriminatory practice leading to plaintiffs' termination, because an employer's decision may fall within one of the exceptions set forth in Corrections Law § 752, Allied's liability under the HRL is not certain.[6]

This analysis establishes that Allied may be liable

---

[5] Even the report cited by the majority suggests that any person or entity subject to section 296 (6) must have sought to assist, instigate or reinforce a discriminatory practice, which according to the majority can only be accomplished by an employer (majority op at 14-15).

[6] Indeed, at trial in the district court, a jury found that Astro did not unlawfully violate the HRL (Griffin, 835 F3d at 287).

either way, and we have come full circle again, because the only reason that Allied is liable is its status as an employer, broadly defined.  The problem is this will not always be the case.  As I have discussed, there will be entities that are not employers, but whose affect on employment results in unfair discrimination against persons with criminal convictions.  Some of these actors may fall within the scope of 296 (6), but some may not because they will not be in a position to compel or coerce, and do not aid or abet because the employer is not aware of their actions and does not discriminate.[7]

IV.

The answer to the first certified question, based on the plain language and purpose of the HRL and section 296 (15), is that the proscriptions in this section are not limited to employers.  That answer makes it unnecessary to consider the second certified question, but regardless, the majority's approach is too limited and excludes certain actors who serve as obstacles to employment opportunities for persons with criminal

---

[7] On the other hand, if the majority intends to cover a person or entity who acts without direction from a direct employer -- e.g., agencies who have internal protocols to maximize profit and maintain a certain reputation by choosing the least riskiest applicant, because those actors aid or abet discrimination or attempt to do so, and not because of some employment relationship (majority op at 11-12) -- then every imaginable entity is covered.  As I have discussed, and as the legislature wisely recognized, a more direct way to achieve that result is to read section 296 (15) to apply to both employers and non-employers.

convictions.  As to the third certified question of whether an out-of-state actor who requires an in-state agent to discriminate may be liable under the aiding and abetting provision of section 296 (6), I would not answer the question because the out-of-state actor would be subject to the prohibitions of section 296 (15). Even if that were not the case, the language and the extra-territorial reach of the HRL requires the question as submitted to be answered in the affirmative.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, the first certified question answered in the affirmative and the remaining questions, as reformulated, answered in accordance with the opinion herein.  Opinion by Chief Judge DiFiore.  Judges Stein, Fahey, Garcia and Wilson concur.  Judge Rivera dissents in an opinion.

Decided May 4, 2017